**UNITED STATES of America ex rel. James M. THOMPSON, Plaintiff,**

**v.**

**COLUMBIA/HCA HEALTHCARE CORPORATION, CHC Holdings, Inc., Columbia Hospital Corporation of Bay Area, Columbia Hospital Corporation of Corpus Christi, Corpus Christi Bay Area Surgery, Ltd., and Columbia Surgicare Specialty Hospital, Defendants.**

Civil Action No. C–95–110.

United States District Court, S.D. Texas, Corpus Christi Division.

Aug. 18, 1998.

John E. O'Neill, Clements, O'Neill, Pierce & Nickens, Houston, TX, David L. Perry, Edwards, Perry & Haas, Corpus Christi, TX, Michael F. Hertz, Depart. of Justice, Civil Div., Washington, DC, for U.S. and James M. Thompson.

Darrell Lee Barger, Barger & Moss, Corpus Christi, TX, Jorge C. Rangel, Law Offies of Jorge Rangel, Corpus Christi, TX, Ernest

E. Figari, Jr., Figari & Davenport, Dallas, TX, for Columbia/HCA Healthcare Corp. of Central Texas, CHC Holdings, Inc., Columbia Hosp. Corp. of Bay Area, Columbia Hosp. Corp. of Corpus Christi and Columbia Surgicare Specialty Hosp.

F. Van Huseman, White, Huseman & Pletcher, Corpus Christi, TX, for Corpus Christi Bay Area Surgery Ltd.

## ORDER

HARMON, District Judge.

The above referenced *qui tam* action alleges that since 1990 Defendants (a health care provider and affiliated entities) submitted false or fraudulent Medicare reimbursement claims in violation of the False Claims Act ("FCA"), 31 U.S.C. §§ 3729 [1] *et seq.* (West 1983 and 1997 Supp.), and violated the Medicare anti-kickback statute, 42 U.S.C. § 1320a–7b(b) (West 1991 & 1997 Supp.),[2] and two versions of the Medicare self-referral statute (commonly known as the "Stark" laws), 42 U.S.C. § 1395nn (West 1992 and 1997 Supp.).[3]

As the Court summarized in its recent order, after this Court dismissed all claims under Fed.R.Civ.P. 12(b)(6), the Fifth Circuit

1. Section 3729 of the FCA provides in relevant part,

> (a) Liability for certain acts.—Any person who—
> (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government ... a false or fraudulent claim for payment or approval;
> (2) knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the Government ...
> is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person.

To state a claim under the FCA, the relator must demonstrate that (1) the defendant presented to the government a claim for payment, (2) the claim was false or fraudulent, (3) the defendant knew that the claim was false, and (4) the government suffered damages as a result of the false or fraudulent claim. *Young–Montenay, Inc. v. United States*, 15 F.3d 1040, 1043 (Fed.Cir.1994).

2. The anti-kickback statute "prohibits (1) the solicitation or receipt of remuneration in return for referrals of Medicare patients, and (2) the offer or payment of remuneration to induce such referrals." *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 901 (5th Cir.1997).

The second amended complaint alleges that Columbia Defendants have induced and continue to induce referrals of Medicare patients by offering physicians such benefits as a preferential opportunities to obtain equity interests in the Columbia healthcare operations, loans to finance capital investments in equity interests in Defendants' subsidiary entities, funds disguised as consultation fees to investing physicians, consultation fees and other monies to referring physicians, reduced rate rents for office space in facilities owned by Defendants, reduced rate vacations, hunting trips, fishing trips and other recreational opportunities to physicians, additional medical training, income guarantees, exclusive rights to perform procedures in particular fields of practice, etc.

3. Title 42 U.S.C. § 1395nn(a)(1)(A) ("Stark I"), in effect from January 1, 1992 until December 31, 1994, prohibited physicians from referring Medicare patients to an entity for clinical laboratory services if the referring physician had a non-exempt "financial relationship," either ownership or investment interest in the entity or a compensation arrangement with such an entity. Section 1395nn(a)(1)(B) further prohibited an entity from presenting or causing to be presented a Medicare claim for services furnished pursuant to a prohibited referral. Stark I in Section 1395nn(g)(1) expressly prohibited payment of Medicare claims for services rendered in violation of its provisions.

Stark II, 42 U.S.C. § 1395nn(a)(1), (h)(6), effective since January 1, 1995, prohibits physicians from referring Medicare patients to an entity for certain "designated health services," including inpatient and outpatient hospital services, where the referring physician has a non-exempt "financial relationship" with such entity. It also prohibits an entity from presenting or causing to be presented a Medicare claim for services furnished pursuant to a prohibited referral and expressly bars payment of Medicare claims for services rendered in violation of its provisions. 42 U.S.C. § 1395nn(a)(1), (g)(1).

The second amended complaint alleges that since October 1990, Columbia Defendants have accepted referrals of Medicare patients from physicians with financial relationships to Columbia and its affiliates that are prohibited by § 1395nn and then have submitted claims for such patients in violation of the statute. Moreover this conduct violates statutes and regulations affecting the administration of Medicare health payment funds, defeats Defendants' rights to apply for and receive Medicare funds, and is required to be disclosed to the government under the express terms of 42 U.S.C. § 1320a–7b(a)(3). Defendants' failure to disclose such conduct, according

affirmed those parts of the Court's decision holding that Thompson's allegations that Defendants submitted claims for medically unnecessary services should be dismissed under Fed.R.Civ.P. 9(b) and that violations of the Medicare anti-kickback statute and the Stark laws, by themselves, do not necessarily give rise to actionable false claims under the FCA. *United States ex. rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899 (5th Cir.1997). In response to Relator James M. Thompson's claim that Defendants violated the FCA by falsely certifying that the Medicare services identified in the hospital annual cost reports complied with the laws and regulations dealing with the provision of healthcare services, the appellate court ordered additional factual development in the record from which it could determine whether the government's payments for the services identified in those annual cost reports were conditioned on the truthfulness of such certifications. In *Thompson*, 125 F.3d at 902, the Fifth Circuit noted that the Ninth Circuit in *United States ex rel. Hopper v. Anton*, 91 F.3d 1261, 1266 (9th Cir.1996), interpreted the scope of the FCA as the Fifth Circuit does and that it "concluded that false certifications of compliance create liability under the FCA when certification is a prerequisite to obtaining a government benefit." Relator James M. Thompson had alleged that the government conditioned payment on the Defendants' certifications and that Defendants falsely certified compliance.

Moreover, the Court of Appeals also vacated that part of the judgment and remanded for further consideration the issues of whether the claims for services rendered in violation of the Stark laws, which expressly prohibit such, constitute false or fraudulent claims under the FCA. Additionally, the Fifth Circuit further pointed out that the FCA imposes liability not only on any person who submits a false or fraudulent claim for payment, but also on a person who knowingly makes a false statement in order to get a false or fraudulent claim paid. 31 U.S.C. § 3729(a)(2). Therefore the appellate court directed this Court, if it concludes that the claims for services rendered in violation of the Stark laws do constitute false or fraudulent claims under the FCA, also to decide whether Thompson has sufficiently alleged that Defendants committed separate and independent violations of the FCA by making false statements to obtain payment of false or fraudulent claims. Finally, the court of appeals left open the issue of claims raised below but not considered in the Court's order of dismissal.[4]

Pending before the Court are the following, interrelated motions:

(1) Defendant Corpus Christi Bay Area Surgery, Ltd.'s ("CBAS'") amended motion to dismiss and, alternatively, motion for summary judgment (# 82);

(2) Defendants Columbia/HCA Healthcare Corporation, CHC Holdings, Inc., Columbia Hospital Corporation of Bay Area, Co-

to the complaint, constitutes fraud and fraudulent concealment under 42 U.S.C. § 1320a-7b(a)(3). The complaint further alleges that Defendants' fraudulent cost reports on HCFA form 2552 (certifying that the services were provided in compliance with healthcare laws and regulations) included services to patients whose physicians received kickbacks or illegal inducements prohibited by § 1320a-7b(b), and were unlawful under 42 U.S.C. § 1395nn because of prohibited financial relationships between Defendants and referring physicians, and/or other laws, thus causing the HCFA form 2552 reports to be "false records or statements." Thus it is the submission for approval or payment of these Medicare claims that violates § 1395nn and § 1320a-7b, and their fraudulent concealment of their illegal actions that, in turn, violates the FCA, according to the second amended complaint.

The second amended complaint alleges an additional, independent claim for violation of 31

U.S.C. § 3729(a)(2) in asserting that Defendants' knowing submission of the false HCFA form 2552 reports, Defendants knowingly made, used or caused to be made or used a false record or statement to get a false claim paid or approved by the government. Relator also alleges that Defendants made a false claim for Medicare payments based on false statements that the Southside Community Hospital was being closed in September 1993 when its operations were merely being moved to another location and continued under a different name.

4. Specifically, the appellate court wrote, . 125 F.3d at 904,

> Defendants ask us to affirm parts of the district court's order of dismissal on grounds raised but not considered below. Although we may consider alternative grounds for upholding the district court's decision, ... we decline to do so in this case. [citation omitted]

lumbia Hospital Corporation of Corpus Christi, and Columbia Surgicare Specialty Hospital's ("Columbia Defendants'") second amended motion to dismiss or, in the alternative, motion for summary judgment (# 85); and

(3) Plaintiff's motion for leave to amend complaint (# 98).

For the reasons indicated below, the Court agrees with Relator that he has stated claims for three separate violations of the FCA, i.e., the allegedly false certifications of compliance with all applicable Medicare statutes and regulations on which the government conditioned payments, the submission of Medicare claims in violation of the Stark laws' express prohibition, and the submission of claims for services rendered in violation of the Medicare Anti–Fraud and Abuse Act. Furthermore, he has stated a separate and independent claim against Defendants for knowingly making a false statement in order to get false or fraudulent claim paid in violation of 31 U.S.C. § 3729(a)(2). The Court therefore denies the motions to dismiss or for summary judgment and grants Relator's motion for leave to amend.

The Court is aware that Relator has had no opportunity to pursue discovery. The purpose of the requested briefing was for this Court to be able to determine at what is still an early stage of this litigation despite the number of years it has been pending, whether, in light of the facts alleged here, which at this point the Court will assume are true, the second amended complaint (# 29) asserts claims cognizable under the law, in particular the FCA. Nevertheless, because the Court has examined materials beyond the pleadings, in particular an affidavit and declaration, it must review the first two motions under a summary judgment standard, but only to determine whether viable claims have been stated as a matter of law.

The movant seeking a federal summary judgment initially must inform the court of the basis for its motion and point out those portions of the pleadings, depositions, answers to interrogatories, and admissions on file that demonstrate the absence of a genuine issue of material fact and show that it is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The movant need not negate the opposing party's claims nor produce evidence showing an absence of a genuine factual issue but may rely on the absence of evidence to support essential elements of opposing party's claims. *International Assoc. of Machinists & Aerospace Workers, Lodge No. 2504 v. Intercontinental Mfg. Co.,* 812 F.2d 219, 222 (5th Cir.1987). The burden then shifts to the non-movant to set forth specific facts and competent summary judgment evidence to raise a genuine issue of material fact on each essential element of any claim on which he bears the burden of proof at trial. Fed. R.Civ.P. 56(c). The substantive law governing the suit identifies the essential elements of the claims at issue and therefore indicates which facts are material. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The non-moving party may not rest on mere allegations or denials in its pleadings but must produce affirmative evidence and specific facts. *Anderson,* 477 U.S. at 256–57, 106 S.Ct. 2505. It meets this burden only if it shows that "a reasonable jury could return a verdict for the non-moving party." *Id.* at 254, 106 S.Ct. 2505. A mere scintilla of evidence will not preclude granting of a motion for summary judgment. *Id.* at 252, 106 S.Ct. 2505.

All reasonable inferences must be drawn in favor of the non-moving party. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), citing *United States v. Diebold,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). Once the burden of proof has shifted to the non-movant, he "must do more that simply show that there is some metaphysical doubt as to the material facts." *Id.* at 586, 106 S.Ct. 1348. Instead he must produce evidence upon which a jury could reasonably base a verdict in his favor. *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505. "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.,* 477 U.S. at 249–

50, 106 S.Ct. 2505. Unsubstantiated and subjective beliefs and opinions are not competent summary judgment evidence. *Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir.), *cert. denied*, 513 U.S. 871, 115 S.Ct. 195, 130 L.Ed.2d 127 (1994); *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir.), *cert. denied*, 506 U.S. 825, 113 S.Ct. 82, 121 L.Ed.2d 46 (1992).

Defendant CBAS' separate, amended motion to dismiss or for summary judgment argues that the Fifth Circuit remanded this case for a determination of only two issues, neither of which applies to CBAS, and that therefore CBAS should be dismissed from the case. Specifically, this Court is to decide (1) whether an annual cost report containing a false certification of compliance with Medicare laws is a false claim and (2) whether a claim for services rendered in violation of the Stark Act is a false claim. In regard to the former, the Fifth Circuit has held that a false claim could arise only if the government conditioned payment of claims on the certification. *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d at 902–03.

Relator's complaint fails to state a false certification claim against CBAS, CBAS insists. Even though the complaint does assert such a claim against the other Defendants, CBAS contends that the second amended complaint fails to make the fundamental allegations that CBAS is a hospital, that it has submitted annual cost reports, and that it has falsely certified that services identified in annual cost reports were rendered in compliance with healthcare laws. Even if Plaintiff have so alleged, CBAS contends, the second amended complaint would still fail because Medicare does not require CBAS to submit annual cost reports or to certify that the services identified in those reports were in compliance with healthcare laws, and therefore certification is no prerequisite to Medicare's paying CBAS.

CBAS points out that Relator's complaint, at 82, states that CBAS is "an outpatient surgical facility." Medicare regulations label a provider of outpatient surgical facilities as an ambulatory surgical center ("ASC"). 42 C.F.R. § 416.2 (1996). In contrast, a hospital is "an institution which is primarily engaged in providing [services] to inpatients." 42 U.S.C. § 1395x(e).

Furthermore, CBAS explains, Medicare reimburses an ASC for its services based upon a fixed rate, not upon actual costs, for the specific surgical procedures performed. 42 U.S.C. § 1395l(i)(2)(A)(i). Therefore Medicare does not need, nor does it require, annual cost reports from an ASC before paying claims for services. Moreover, although Medicare regulations applying to hospitals (§§ 413.20 and 413.24) require the hospitals to comply with Medicare's cost-reporting provisions, the ASC-specific regulations (42 C.F.R. Part 416) do not. Also, under Medicare cost-reporting regulations, providers subject to filing cost reports include hospitals, but not ASCs. 42 C.F.R. § 413.1(a)(2). While the administrator or chief financial officer of a hospital must certify that the services identified in a hospital's annual cost report (42 C.F.R. § 413.24(f)(4)(ii)) were provided in compliance with Medicare's laws and regulations, such certification does not apply to CBAS as an ASC. In sum, Medicare does not require annual cost reports or certifications of compliance with cost reports from CBAS and has not conditioned payment of CBAS' claims upon CBAS' certification of compliance with healthcare laws. Thus Relator has failed to state a statutory claim for relief against CBAS.

CBAS also insists that the Stark Act, 42 U.S.C. § 1395nn(a)(1), does not apply to CBAS because (1) CBAS does not maintain prohibited relationships with physicians and (2) it provides ambulatory surgical center services. Noting that Relator complains about CBAS' alleged payments to scrub techs, CBAS contends that the Stark Act applies only to referrals based on certain relationships: "if a physician ... has a financial relationship with an entity ... then, the physician may not make a referral to the entity for the furnishing of designated health services." 42 U.S.C. § 1395nn(a)(1). CBAS concludes that the complaint's allegations refer to financial relationships of CBAS with non-physician scrub techs and that such relationships do not violate the Stark Act. In addition, the Stark referral prohibitions ap-

ply only to "designated health services," *id.*, and do not include ASC facility services. § 1395nn(h)(6)(K). In sum, CBAS insists, not only is CBAS not a hospital, but Medicare regulations specifically except ASC services from Stark's referral prohibitions. 42 C.F.R. § 411.355(d).

In the event that the Court cannot determine from the pleadings alone that dismissal is appropriate, to support its entitlement to a summary judgment CBAS submits an affidavit from Gene Hybner proving that CBAS is an ambulatory service center providing ASC services, and not filing annual cost reports or certifications of compliance.

Remaining Columbia Defendants' second amended motion to dismiss or, in the alternative, motion for summary judgment argues that dismissal is appropriate on the grounds that (1) Relator lacks standing to bring the claims (Fed.R.Civ.P.12(b)(1)), (2) the complaint fails to satisfy Fed.R.Civ.P. 9(b), and (3) the complaint fails to state a claim for which relief may be granted, under Fed. R.Civ.P. 12(b)(6). Alternatively, Defendants request a summary judgment in their favor.

Before addressing the matters expressly remanded for consideration, the Court will examine the standing issue raised by Defendants. Relying on a recent ruling by Judge Kenneth Hoyt,[5] Defendants first argue that this Court lacks subject matter jurisdiction because the *qui tam* provisions of the FCA are an unconstitutional violation of the principles of separation of powers in giving Thompson, who has no cognizable injury, standing to sue. Next, Defendants identify the first issue remanded by the Fifth Circuit for consideration as "whether or not, or to what extent payment for services identified in defendants' annual cost reports was conditioned on defendants' certifications of compliance." 125 F.3d at 902–03. The second issue on remand is whether the Stark laws' express prohibition on payment for services rendered in violation of their terms rendered those particular statutory violations actionable under the FCA. *Id.* at 903. The Fifth

Circuit further stated that if this Court determines on remand that Defendants' claims for services rendered in violation of the Stark laws constitute false or fraudulent claims under the FCA, then this Court should also determine whether Thompson adequately alleged that the Columbia Defendants committed separate violations of 31 U.S.C. § 3729(a)(2) by making false statements to obtain such claims. *Id.* Furthermore, the Fifth Circuit left open for this Court the opportunity to address alternative grounds supporting dismissal that were raised in the original motion to dismiss but not reached by this Court when it dismissed the suit. Defendants identify the following as those raised but undecided questions: (1) whether Thompson failed to state a claim against Columbia/HCA and CHC Holdings: (2) whether Thompson adequately alleged a violation of Stark I, which prohibited only financial relationships between physicians and entities related to the provision of clinical laboratory services; and (3) whether Thompson failed to plead with particularity, as required by Fed.R.Civ.P. 9(b), with respect to claims against Columbia/HCA and CHC Holdings, claims related to the conduct of any Columbia-affiliated entities outside the Corpus Christi area, and claims based on alleged violations of Stark I if Thompson is alleging that any physicians had non-exempt financial relationships with the hospitals that related to the provision of clinical laboratory services.

The Columbia Defendants provide a review of procedures under used by the government in paying Medicare claims. Medicare payments for hospital inpatient and outpatient services are made by Medicare fiscal intermediaries, usually private insurance companies under contract with the Medicare program. 42 U.S.C. § 1395h (West 1992 & Supp.1998). During the years relevant in this action, Medicare paid providers of hospital inpatient services under its prospective payment system ("PPS"), 42 U.S.C. § 1395ww(d) (West 1992 & Supp.1998). Under PPS, the hospital receives a fixed amount

**5.** . *United States ex rel. Riley v. St. Luke's Episcopal Hospital,* 982 F.Supp. 1261, 1263 (S.D.Tex.1997) (holding that Congress cannot, consistent with the constitutional principles of the separation of powers, confer standing on a *qui tam* plaintiff who has suffered no cognizable injury to allow that plaintiff to prosecute an FCA action on the government's behalf).

based on a patient's diagnosis, regardless of the actual costs incurred in treating the patient. Therefore the information in a Medicare cost reporting form, such as Form 2552 promulgated by the Health Care Financing Administration ("HCFA") and relied upon by Thompson here, is not relevant in determining the amount of Medicare payments to hospitals for most inpatient hospital services.

A hospital submits bills for both inpatient and outpatient services to its Medicare fiscal intermediaries shortly after providing services to a patient.[6] The billing information is submitted either electronically or on a "UB–92" form. *See* Medicare Intermediary Manual § 3602.5 and Ex. 2 to Appendix filed on November 29, 1995. The hospital submits a separate UB–92 form for each patient and each episode of care. The Medicare fiscal intermediaries and Medicare peer review organizations subject the bills to intensive review to determine that all services are medically necessary. 42 U.S.C. §§ 1320 *et seq.*

As their second ground for dismissal, after their challenge to the constitutionality of the *qui tam* provisions, the Columbia Defendants contend that cost report certifications are not a condition of the government's payment of Medicare claims. On appeal, the Fifth Circuit, relying on its prior holding in *United States ex rel. Weinberger v. Equifax,* 557 F.2d 456 (5th Cir.1977), *cert. denied,* 434 U.S. 1035, 98 S.Ct. 768, 54 L.Ed.2d 782 (1978)[7] and the Ninth Circuit's holding in *United States ex rel. Hopper v. Anton,* 91 F.3d 1261, 1266 (9th Cir.1996), reaffirmed that "violations of law, rules, or regulations alone do not create a cause of action under the FCA." *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.,* 125 F.3d at 902 (quoting *Hopper,* 91 F.3d at 1266). Highlighting the Fifth Circuit's indication that an FCA cause of action might be stated where a truthful certification of compliance with such laws and regulations is "a prerequisite to obtaining a government benefit," 125 F.3d at 902, the Columbia Defendants follow the Ninth Circuit is identifying as the two major questions for the cost certification claim "(1) whether the false statement is the cause of the Government's providing the benefit; and (2) whether any relation exists between the subject matter of the false statement and the event triggering the Government's loss." *Hopper,* 91 F.3d at 1266 (quoting J.T. Boese, *Civil False Claim and Qui Tam Actions,* 1–29 to 1–30 (1995)).

---

6. In a footnote, Defendants observe that certain inpatient services, such as psychiatric services and rehabilitation services, are exempt from PPS and continue to be reimbursed on a cost basis. 42 U.S.C. § 1395ww(b); 42 C.F.R. §§ 412.20 *et seq.* Furthermore, Medicare payments for hospital outpatient services are based on a provider's hospital-specific costs and, subject to various exceptions, hospitals usually are reimbursed 80% of their allowable costs of providing outpatient services. 42 U.S.C. § 13951(a).

7. The issues in *Equifax* grew out of Equifax's business which included gathering information on prospective employees for the government pursuant to contracts with the government. In uncovering the information, Equifax allegedly employed detective-like agencies in violation of the Anti–Pinkerton Act. The Fifth Circuit viewed as Relator's FCA claim against Equifax "that Equifax misrepresented its qualification for government employment and thus made a false claim." 557 F.2d at 459. The Fifth Circuit stated, "The False Claims Act 'was not designed to reach every kind of fraud practiced on the Government.'" *Id., quoting United States v. McNinch,* 356 U.S. 595, 599, 78 S.Ct. 950, 2 L.Ed.2d 1001 (1958). The panel stated, "The statute is primarily directed against government contractors' billing for nonexistent or worthless goods or charging exorbitant prices for delivered goods." *Id.,* at 460, quoting 356 U.S. at 599, 78 S.Ct. 950. This Court observes that such a view is today restrictive and dated in light of the recent trend of applying the FCA to healthcare fraud, discussed later.

The *Equifax* court, however, did indicate that to demonstrate fraud under the FCA, a plaintiff must show that the government was misled by a defendant's application for payment of funds by the government. *Id.* at 461. Under the circumstances in that particular case, the appellate court concluded that "Unless the government made it clear that it would not employ detective agencies when it contracted for work, Equifax's application did not make a material misrepresentation, did not mislead the government, and did not defraud the government within the meaning" of the FCA. *Id.* In the instant case, Defendants allegedly knowingly misrepresented and concealed clearly illegal conduct, established as such by statute and regulation, to gain payment for Medicare services. Relator has also provided evidence, discussed *infra,* that the government conditioned its payment or approval of payment, retention of benefits, and eligibility for the Medicare program on the allegedly false certifications that Defendants had complied with relevant law.

The Columbia Defendants maintain that the HCFA form 2552 certification at issue here does not meet these requirements. First, they insist that the certification is not a condition of payment. The conditions under which Medicare providers can be reimbursed for services rendered to Medicare patients are set out in 42 U.S.C. § 1395f and explained by regulations located at 42 C.F.R. §§ 424.1 *et seq.* Conditions for a medical provider's eligibility are found at 42 U.S.C. § 1395cc. While a certification by a physician that the services are medically necessary is among these, there is no express requirement of a general certification of compliance with every extant Medicare law and regulation, insist Columbia Defendants. Nor does 42 U.S.C. § 1395g(a), the authority under which the government requires the submission of cost reports, contain any suggestion that a certification of compliance with all Medicare laws and regulations is a prerequisite to payment. Section 1395g(a) only authorizes the government to withhold payments to a provider until "it has furnished such information as the Secretary may request in order to determine the amounts due...." The Columbia Defendants summarize that although receipt by the government of the financial information contained in a cost report may be a condition to payment, the HCFA form 2552 certification cited by Thompson is not one. The second factor in *Hopper,* 91 F.3d at 1266, i.e., whether there is any relation between the subject of the false statement and the government's loss, is relevant here, according to Defendants, because the FCA requires an injury to the public fisc, and allegedly false certifications that have no nexus to that injury will not give rise to FCA liability. Government contractors are routinely required to certify their compliance with statutes and regulations, such as employment discrimination laws, which have no relationship to the validity of their requests for payment. The Columbia Defendants argue that the HCFA form 2552 certification of general compliance with Medicare laws and regulations is neither a cause in fact of the government's payment of benefits, nor a proximate cause of any injury to the Treasury, which is what the FCA was designed to remedy. They further urge that since the Medicare system imposes a myriad of complex requirements upon hospitals, the HCFA form 2552 certification cannot be singled out as a stalking horse for every type of regulatory violation, and the FCA does not provide a remedy for every statutory or regulatory violation. In other words, the cost report certification process cannot be transformed into a "mega remedy." They insist that the certification claim fails as a matter of law. Furthermore, note the Columbia Defendants, all but two of the cost reports at issue[8] did not contain such a certification. *See* Exhibits to Strickland Declaration, Ex. A.

The Columbia Defendants also contend that the alleged violations of the Stark laws, in spite of their express prohibition on payments for services rendered in violation of the laws, do not give rise to actionable false claims under the FCA. They insist that a pecuniary injury is an essential element of such claims. The statute "reaches all types of fraud, without qualification, that might result in financial loss to the Government." *United States v. Neifert–White Co.,* 390 U.S. 228, 232, 88 S.Ct. 959, 19 L.Ed.2d 1061 (1968); *Peterson v. Weinberger,* 508 F.2d 45, 52 (5th Cir.) ("[a] claim is within the purview of the False Claims Act if it is grounded in fraud which might result in financial loss to the Government."), *cert. denied,* 423 U.S. 830, 96 S.Ct. 50, 46 L.Ed.2d 47 (1975). While the FCA aims "to protect the funds and property of the Government from fraudulent claims," *Rainwater v. United States,* 356 U.S. 590, 592, 78 S.Ct. 946, 2 L.Ed.2d 996 (1958), "[I]t is equally clear that the [FCA] was not designed to reach every kind of fraud practiced on the Government." *United States v. McNinch,* 356 U.S. 595, 599, 78 S.Ct. 950, 2 L.Ed.2d 1001 (1958). A claim that does not include actual injury to the Treasury is not

---

**8.** HCFA only promulgated a form 2552 with a compliance certification requirement in March 1993, and therefore there were only two annual cost reports with such certifications submitted by any of the hospitals before the complaint was filed. The Columbia Defendants represent that the Court may take judicial notice of the actual certifications in considering a Rule 12(b) motion to dismiss. 78 F.3d 1015, 1018 (5th Cir.1996).

actionable under the FCA. *United States v. Cohn*, 270 U.S. 339, 346–47, 46 S.Ct. 251, 70 L.Ed. 616 (1926) ("defrauding" in the statute must be construed in the ordinary sense of "relating to the fraudulent causing of pecuniary or property loss"; concluding that defendant did not "defraud" government customs officials within the meaning of the FCA where it was acting as a bailee of goods).[9] Other courts have taken the same approach where the government has not been required to pay out more than it would have but for the alleged fraud. *See, e.g., United States v. Azzarelli Constr. Co.*, 647 F.2d 757, 762 (7th Cir.1981) (because federal contribution to state highway program was fixed sum, no FCA claim was stated by the government against contractors involved in alleged bid-rigging scheme because it was the state's and not the federal government's treasury funds that were being reduced by overcharges).[10]

Defendants observe that while a false or fraudulent claim must be capable of causing damage to the public fisc, the civil monetary penalties under the FCA function as liquidated damages to allow recovery where the damages are difficult to quantify. *United States v. Halper*, 490 U.S. 435, 444, 109 S.Ct. 1892, 104 L.Ed.2d 487 (1989). Therefore a *qui tam* plaintiff does not need to plead and prove the specific damages suffered by the government if he seeks only the statutory civil penalties. *Rex Trailer Co. v. United States*, 350 U.S. 148, 152–53, 76 S.Ct. 219, 100 L.Ed. 149 (1956). Nevertheless, the plaintiff must demonstrate threatened injury to the United States Treasury. *Halper*, 490 U.S. at 445, 109 S.Ct. 1892 ("Although the Court [in *Rex Trailer*] recognized that the Government's loss due to the defendants' fraud was difficult if not impossible to ascertain, it recognized that the Government did sustain injury. . . .").[11] *See also United States v. Ad-*

9. Relator objects that *Cohn* was decided under the subsequently superseded 1918 amendment to the FCA, which required the claim to be submitted specifically for the purpose and with the intent to cheat, swindle, or defraud the government. *United States v. Rohleder*, 157 F.2d 126, 128 (3d Cir.1946), relied on by the Fifth Circuit in *United States v. Ridglea State Bank*, 357 F.2d 495 (5th Cir.1966). After the 1934 amendment, actual pecuniary loss was no longer required. *Id.* at 129.

Furthermore, Relator emphasizes, the claim in *Cohn* was not against the government, but a false statement to obtain possession of a private party's merchandise in a warehouse. The Supreme Court concluded that the FCA requires a claim based on the government's own liability to the claimant. *Cohn*, 270 U.S. at 345–46, 46 S.Ct. 251. Here Columbia Defendants cannot show that the Medicare claims submitted for payment in this case do not constitute a claim against the government within the meaning of the FCA, so *Cohn* is not authority for Columbia Defendants' argument here.

10. Defendants note that in *Azzarelli* the court hinted that no claim for payment from the government had been submitted. The 1986 amendments to the FCA now require that a "claim" include a request or demand upon a grantee of federal funds. 31 U.S.C. § 3729(c).

Relator, in his second response to the motion to dismiss, observes that to the extent that *Azzarelli* relies on *Cohn* for the proposition that actual pecuniary injury to the government must be demonstrated under the FCA, it failed to consider that the 1934 amendment eliminated the requirement.

11. In his response, Relator argues that *Halper* does not support Defendants' characterization of it as a "clear statement . . . that actual financial harm is a necessary element of an FCA claim." Not only did the Supreme Court not address this issue, he contends, but the only question in the case was "whether and under what circumstances a civil penalty may constitute 'punishment' for the purposes of double jeopardy analysis." 490 U.S. at 436, 109 S.Ct. 1892. In that case the sole, specific issue is "whether the statutory penalty authorized by the civil False Claims Act, under which Halper is subject to liability of $130,000 for false claims amounting to $585, constitutes a second 'punishment' for the purpose of double jeopardy analysis." *Id.* at 441, 109 S.Ct. 1892. The passing discussion of the kind and character of injury to the government that was demonstrated in two earlier cases is not a reaffirmation or clear statement that financial loss to the government is an element of a civil FCA claim. Furthermore, the Supreme Court disavowed *Halper*'s reasoning and made clear that *Halper* addressed only double jeopardy issues in its recent decision in *Hudson v. United States*, 522 U.S. 93, 118 S.Ct. 488, 139 L.Ed.2d 450 (1997).

This Court notes that in *Hudson v. United States*, the Supreme Court announced that it was "disavowing" the Halper decision and returning to a narrower interpretation of the Fifth Amendment that had controlled before 1989. Justice Rehnquist, writing for the majority, concluded that the double jeopardy clause protects only against imposition of multiple *criminal* punishments for the same offense and then only if it occurs in successive proceedings.

In its *amicus curiae* brief, the government similarly contends that the citation to *Halper* is inap-

*vance Tool Co.,* 902 F.Supp. 1011 (W.D.Mo. 1995) (awarding civil penalties where government could not prove amount of actual damages although it could prove fact of damage), *aff'd,* 86 F.3d 1159 (8th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1254, 137 L.Ed.2d 334 (1997).[12]

Columbia Defendants maintain that alleged violations of the Stark laws do not necessarily result in injury to the Treasury, as required by the FCA. While the Stark laws, in contrast to the anti-kickback statute, prohibit payment for services rendered to patients referred by physicians in violation of the laws' provisions, 42 U.S.C. § 1395nn(g)(1), Defendants charge that Relator has not alleged that the government was required to pay more than it otherwise would if no violations of the Stark laws had occurred. The government would have paid the same amounts for inpatient services, which are reimbursed at a fixed rate, if physicians had referred the patients to other hospitals. Under Relator's analysis, urge Defendants, they would be "potentially responsible for draconian civil monetary penalties even if their allegedly unlawful relationships with physicians practicing at the Hospitals *saved* the government money in Medicare benefits," a concept contrary to the purpose of the FCA. Yet Columbia Defendants concede that the language in *U.S. ex rel. Weinberger v. Equifax, Inc.,* 557 F.2d 456 (5th Cir.1977), and *Peterson v. Weinberger,* 508 F.2d 45, about what constitutes a false claim can be read to encompass Relator's claims of Stark laws violations here. Nevertheless they assert that *Halper,* decided since, demonstrates that the government must be actually damaged and that the FCA was not intended to remedy fraud in the "sense of interfering with

or obstructing ... lawful government functions by deceitful and fraudulent means." *Cohn,* 270 U.S. at 346, 46 S.Ct. 251.

Columbia Defendants further argue that FCA liability should not attach based on a post-hoc determination that those claims fell on the wrong side of an often indistinct regulatory line. *United States ex rel. Windsor v. DynCorp,* 895 F.Supp. 844, 851–52 (E.D.Va. 1995) (FCA claim could not be predicated on alleged misclassification of employees under Davis–Bacon Act where Department of Labor had not made determination that employees were, in fact, misclassified).

Defendants contend that prohibitions on billing and payment in the Stark laws are like penalties designed to deter Medicare referrals by physicians who have prohibited financial relationships with providers of Medicare services. The statute is a prophylactic and is not concerned with whether the services were medically necessary or would have been rendered by another provider. In contrast, they maintain, the FCA is a remedial statute designed to recoup actual losses incurred by the Treasury. Therefore Relator must allege the existence of claims resulting in such losses, not merely that services were performed and a billing submitted in violation of the Stark laws.

In remanding this case, the Fifth Circuit stated that if this Court determined that claims for services allegedly in violation of the Stark laws constituted false or fraudulent claims under the FCA, it should decide whether Relator adequately pleaded separate violations of § 3729(a)(2) in asserting that Defendants' alleged false statements were made to obtain Medicare funds from the government. Since the Relator's complaint does not allege even generally any false

posite. 490 U.S. at 441, 109 S.Ct. 1892. It has no bearing on whether the government must suffer pecuniary loss or harm for liability to attach under the FCA.

**12.** Defendants quote from J.T. Boese, *Civil False Claims and Qui Tam Actions* at 2–13 (Supp.1988) to explain the significant difference between the existence of pecuniary harm and proof of specific damages:

Many of the cases not requiring specific proof of damages in general still require some impact on the Federal treasury. Expanding the

scope of liability under [31 U.S.C. § 3729(a)(1) ] to actions that have no impact on the Federal treasury would seem to divorce the Civil False Claims Act from its essential purpose—recovering monies wrongfully taken from the Federal treasury. Moreover, assessing penalties where the Federal treasury suffers no loss would remove the remedial nature of the penalties and render the penalties punitive, with obvious implications for Federal enforcement.

statements by Defendants other than the alleged false certifications of the HCFA form 2552, Columbia Defendants insist that there is no basis for additional, independent violations of § 3729(a)(2).

Columbia Defendants contend that Relator's claims against Columbia/HCA and CHC Holdings fail to state a claim for which relief can be granted because his only factual allegations are their ownership interests in Columbia Hospital Corporation of Bay Area and Columbia Hospital Corporation of Corpus Christi. The last two entities are general partners of Bay Area Healthcare Group Ltd. and Corpus Christi Healthcare Group, Ltd., the entities that actually own the Hospitals to which the alleged illegal referrals of patients were made. Relator does not allege that Columbia/HCA or CHC Holdings ever submitted any claims for Medicare reimbursement nor assert any facts that would render them liable under the FCA. He merely states that Columbia/HCA "is liable for the conduct of the remaining defendants...." Such a conclusory allegation cannot withstand a motion to dismiss. *Fernandez–Montes v. Allied Pilots Ass'n,* 987 F.2d 278, 284 (5th Cir.1993). Shareholders of a corporation, on that basis alone, are not liable for the tortious acts of the corporation. *United States ex rel. Piacentile v. Wolk,* 1995 WL 20833 at *4 (E.D.Pa. 1995) (shareholder not liable for corporation's violation of the FCA where there was no basis for piercing the corporate veil) (copy attached to supporting brief (# 86) as Ex. A). Thus the claims should be dismissed, urge Defendants.

Columbia Defendants also maintain that, as a matter of law, Relator has not alleged a violation of Stark I, which was in effect from January 1, 1992 until December 31, 1992 and which addressed only referrals for clinical laboratory services. 42 U.S.C. § 1395nn(a)(1)(A) (West 1992). Stark I's prohibition against physicians with a financial relationship with the entity furnishing clinical laboratory services does not apply "[i]n the case of a financial relationship with a hospital if the financial relationship does not relate to the provision of clinical laboratory services." 42 U.S.C. § 1395nn(b)(4). Moreover, Stark I provided that an owner-

ship or investment interest in a hospital would not constitute a prohibited financial arrangement if (1) the referring physician was authorized to perform the services at the hospital and (2) the ownership or investment interest was in the hospital itself, and not merely a subdivision thereof. 42 U.S.C, § 1395nn(d)(3) (West 1992). Defendants maintain that these two exceptions cover all possible financial relationships between physicians and hospitals that are limited to either ownership/investment interests or compensation arrangement. 42 U.S.C. § 1395nn(a)(2). The relevant regulations also provide that compensation arrangements that do not relate to the furnishing of clinical laboratory services are excluded from the scope of financial relationships that will invoke the statutory prohibition, and they confirm that an ownership or investment interest in a hospital is not prohibited if the referring physician is authorized to perform services at the hospital and the interest is "in the entire hospital and not merely a distinct part or department of the hospital." 42 C.F.R. §§ 411.357(g) and 411.356(c)(3)(i). The second amended complaint, insist Defendants, does not allege any financial arrangements between physicians and the Hospitals that fall outside these broad exceptions. Relator has only alleged as financial relationships between the Hospitals and physicians such matters as below-market rent and hunting and fishing trips, but nothing related to the provision of laboratory services. Moreover his allegations fall within the hospital ownership exception to the Stark laws since the limited partnership interests were interests in the Hospitals as a whole and were allegedly offered only to those in a position to make referrals, i.e., to physicians authorized to practice at the Hospitals.

Finally, Columbia Defendants urge the Court to dismiss the complaint for lack of specificity and particularity, required by Fed. R.Civ.P. 9(b). The Fifth Circuit in the appeal of this case stated that the FCA claims must satisfy Rule 9(b). 125 F.3d at 903. Thus Relator must state, at minimum, the "who, what, when, where and how" of the alleged fraud. *Id., quoting Williams v. WMX Tech. Inc.,* 112 F.3d 175, 179 (5th Cir.1997), *cert. denied,* —— U.S. ——, 118

S.Ct. 412, 139 L.Ed.2d 315 (1997). *See also United States v. Crescent City E.M.S., Inc.,* 151 F.R.D. 288, 290–91 (E.D.La.1993) (Rule 9(b) required government in FCA case to allege specifics regarding purported false claims, including dates, persons responsible, and factual basis for conclusory allegation that patients were not eligible for Medicare).[13] For alleged violations of Stark I, Relator must identify which physicians, if any, had non-exempt financial relationships with the Corpus Christi Hospitals and which claims, if any, were submitted for clinical laboratory services.

In a "preliminary response"[14] and subsequent response, Relator insists that the Court has subject matter jurisdiction because the Relator does have standing to prosecute this claim. Criticizing *United States ex rel. Riley v. St. Luke's Episcopal Hosp.,* 982 F.Supp. 1261 (S.D.Tex.1997), as the "first reported decision in more than 130 years of the FCA's existence holding that a *qui tam* relator lacked standing to prosecute an FCA case because the relator had not personally suffered a cognizable injury in fact" and a solitary aberration contrary to the overwhelming weight of authority on the constitutional standing issue, Relator points out that Judge Samuel Kent two months later summarily rejected *Riley* "in light of the congressional purpose underlying the FCA and its plain language." *Hopkins v. Actions, Inc. of Brazoria County,* 985 F.Supp. 706, 710 (S.D.Tex.1997). Relator asserts to the Court that the leading decision on the issue is probably *United States ex rel. Kelly v. Boeing Co.,* 9 F.3d 743 (9th Cir.1993), which

rejected the constitutional challenge embraced by Judge Hoyt in *Riley.* The Ninth Circuit did not agree that the only cognizable injuries in a *qui tam* suit are injuries to the federal Treasury resulting from false claims against the United States and therefor *qui tam* relators lack constitutional standing because they have not personally suffered harm. *Id.* at 748. Instead, the Ninth Circuit concluded that the FCA effectively assigns the government's claims to the *qui tam* relator, who may then sue based on the injury to the federal Treasury. Thus because the government can establish injury in fact, causation, and redressibility, the relator can also satisfy these Article III requirements. *Id.* (and cases cited therein). *Kelly* also rejected concerns based on the principles of separation of powers. *Id.* at 749–53.

Relator points out that the only Fifth Circuit opinion dealing with the standing issue, and therefore subject matter jurisdiction, *United States ex rel. Weinberger v. Equifax, Inc.,* 557 F.2d 456, 460 (5th Cir.1977), found that the FCA "grants informers standing to sue and an award for successful action under the statute." The Court of Appeals for the Fourth Circuit recognized that the United States is the real party in interest in an FCA case, even when it elects not to control the suit. *See also United States ex rel. Milam v. University of Texas M.D. Anderson Cancer Center,* 961 F.2d 46, 48–49 (4th Cir.1992) (recognizing that the government, not the relator, must have suffered the injury in fact required for Article III standing). Furthermore, observes Relator, the Ohio district court in *United States ex rel. Roby v. Boeing*

**13.** The Court notes that *Crescent City* is distinguishable from the instant suit. In *Crescent City,* the government sued an ambulance service for payments the government had made during a six-month period based on 501 claims asserted on behalf of 18 named Medicare patients whom the defendants "knew or should have known" did not qualify for Medicare. In dismissing the suit for inadequate pleading under Rule 9(b) because the government did not identify the exact dates of the alleged false claims, the identity of the person making the claim, or the place where the alleged fraud took place, the court noted that both parties' pleadings suggested that this information was within the plaintiff's own records, that the government asserted no facts to support its fraud allegations against two defendants, but only that they knew or should have known of the

noneligibility, and no factual allegations to support its claim of noneligibility, and it made no effort to tie the defendants to the fraud claims. While allegations against defendants collectively may be acceptable where there is a statement of the facts giving rise to the plaintiff's belief that fraud occurred, the government failed to do so. In contrast here, plaintiff has laid a detailed factual framework for its claims and does not have its own record to provide key facts.

**14.** The preliminary response preceded and was conditioned on Relator's unopposed motion to extend the response deadline until June 2, 1998. That motion was granted, and Relator filed the subsequent timely response.

*Co.*, 995 F.Supp. 790, 794 n. 5 (S.D.Ohio 1998), also rejected the argument advanced by the Columbia Defendants and accepted in *Riley.* Instead, the *Roby* court held that in view of the "present landscape of the courts' decisions surrounding standing under the qui tam provisions of the FCA," which it surveys, a *qui tam* plaintiff has standing to pursue claims on the government's behalf for injuries suffered by the government. *Id.* at 795. Thus, concludes Relator, "*Riley* represents a solitary aberration against the overwhelming weight of authority on the constitutional standing issue" and exhibits flawed reasoning, with a resulting incorrect conclusion. Relator maintains that this Court has subject matter jurisdiction here because Relator has constitutionally sufficient standing to pursue his FCA suit.

Furthermore, Relator argues, the second amended complaint, not to mention the proposed third amended complaint, does state claims for three different violations of the FCA based on three distinct courses of conduct: (1) the submission of Medicare claims in violation of the Stark laws; (2) the submission of Medicare claims for services rendered in violation of the Medicare Anti–Fraud and Abuse Act; and (3) the false certification that all of its Medicare services were rendered and billed to the government in compliance with all applicable statutes and regulations, including, by implication, the Stark and Medicare Anti–Fraud and Abuse Acts.[15]

As one Congressional weapon to root out Medicare fraud, the Medicare Anti–Fraud and Abuse Act, 42 U.S.C. § 1320a–7b (Supp. 1996),[16] prohibits the payment of money or any other thing of value to induce the referral of Medicare Patients, characterized as fraudulent "illegal remuneration." 42 U.S.C. § 1320a–7b(b)(2). It also prohibits making any false statement in applying for Medicare payments, *id.*, at § 1320a–7b(a)(1); concealment or failure to disclose certain material information, *id.* at § 1320a–7b(b)(3); and making false statements or representations to qualify as a certified Medicare provider, *id.* at § 1320a–7b(c).

A second weapon is the Stark II law, 42 U.S.C. § 1395nn (Supp.1996), which explicitly

---

**15.** In the subsequent response, Relator reverses the order of 2 and 3 in his listing and discussion.

In Relator's second response filed in conjunction with its motion for leave to file third amended complaint, he challenges Columbia Defendants' identification of the issues remaining for this Court's determination after the Fifth Circuit mandate issued. Relator emphasizes that the Fifth Circuit denied Columbia Defendants' Rule 12(b)(6) motion seeking dismissal of the claims based on Columbia's false certification of compliance with applicable Medicare statutes, rules, and regulations in its submissions of annual cost reports, that it remanded the issue for "further factual development," that the ruling is now the law of the case, and that Columbia has offered no evidence to satisfy the order for factual development. *United States ex rel. Thompson*, 125 F.3d at 903.

**16.** The Anti–Kickback statute, 42 U.S.C. § 1320a–7b (Supp.1996), which prohibits any person or entity from "knowingly and willfully" making or accepting payment for referrals for federally funded medical services in return for a kickback, states in pertinent part,

(b) Illegal remuneration
(1) whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind—

(A) in return for referring an individual to a person for the furnishing of any item to or service for which payment may be made in whole or in part under a Federal health care program, or
(B) in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing or ordering any good, facility, service, or item for which payment may be made in whole or in part, under a Federal health care program, shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.
(2) whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person—
(A) to refer an individual to a person for the furnishing or arranging for the furnishing or any item or service for which payment may be made in whole or in part under a Federal health care program, or
(b) to purchase, lease, order or arrange for or recommend purchasing, leasing or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felon and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

bars Medicare payments that issue from the kind of self-referral scheme established by the Columbia Defendants. Stark I, 42 U.S.C. § 1395nn(a)(1) (1992), which was more limited, barred physicians from referring Medicare patients for laboratory services to clinical laboratories in which the physicians had a financial interest and barred Medicare payment for a service that violated that prohibition. Through the Omnibus Budget Reconciliation Act of 1993, P.L. 103–66 § 5074 amending Section 1877 of the Social Security Act, Stark II expanded the prohibition on physician self-referrals from clinical laboratory services to reach a wider array of eleven "designated health services," including *inter alia* clinical laboratory services, radiology services, radiation therapy, durable medical equipment and supplies, home health services, and in-patient and out-patient services. 42 U.S.C. § 1395nn(h)(6) (Supp.1996). Stark II applies to referrals made after December 31, 1994.

Relator insists that for the purposes of a motion to dismiss under Fed.R.Civ.P. 12(b)(6), his allegations that the Columbia scheme of inducements and financial relationships in the second amended complaint violate Stark II must be taken as true, and the effect of the violation must then be determined. Under Stark II, an entity that accepts a prohibited referral is prohibited from presenting a Medicare claim or bill for its services to the government or any third-party intermediary. If such claims are presented, subsection (g) mandates that no payment may be made. 42 U.S.C. § 1395nn(g)(1) (Supp.1996). Thus even though Columbia is not entitled to present or

receive Medicare claim payments for any of the services provided to Medicare patients referred by physicians enmeshed in the self-referral system outlined in the second amended complaint, HCFA has paid millions of dollars to Columbia for thousands of such illegal claims. Relator maintains that Columbia's knowing presentation of these claims for payment when payment could not lawfully be made, is the first violation of the False Claims Act.

Relator explains that the gravamen of his *qui tam* suit is that Columbia/HCA Healthcare, by means of its various owned and controlled subsidiary hospitals and entities, engineered and established an elaborate network of prohibited ownership and compensation arrangements resulting in the submission and payments of millions of dollars in Medicare claims for patients referred by physicians who were prohibited from making these patient referrals to Columbia under the Stark laws. Columbia was expressly barred from submitting those claims under 42 U.S.C. § 1395nn(a)(1),[17] while it was prohibited from receiving payment for those claims under 42 U.S.C. § 1395nn(g)(1).[18] In sum, Relator charges that Columbia's Medicare claims violate the FCA because their presentation and payment were statutorily prohibited.[19]

By analogy, Relator relies on *Peterson v. Weinberger*, 508 F.2d 45, 52 (5th Cir.), *cert. denied sub nom. Peterson v. Mathews*, 423 U.S. 830, 96 S.Ct. 50, 46 L.Ed.2d 47 (1975) (holding that the knowing submission of Medicare claims for services that were not covered and payable under the Medicare Act

---

42 U.S.C. § 1320a–7b(b)(1) & (2).

**17.** Stark II provides that where a physician has a "financial relationship" (an ownership or investment interest or a compensation arrangement) with a health care entity,

(A) the physician may not make a referral to the entity for the furnishing of designated health services for which [Medicare] payment otherwise may be made . . ., and
(B) the entity may not present or cause to be presented a [Medicare] claim . . . or bill to any individual, third-party payor or other entity for designated health services furnished pursuant to a referral prohibited under subparagraph (A).
42 U.S.C. § 1395nn(a)(1).

**18.** Section 1395nn(g)(1) provides regarding "**Denial of Payment**," "No payment may be made under this subchapter for a designated health service which is provided in violation of subsection (a)(1) of this Section."

**19.** Relator further notes that HCFA's implementing regulations, which establish administrative penalties for Stark II violations, are non-exclusive additions to other penalties provided by law. 42 C.F.R. § 1003.108 (1996). The regulatory framework for Stark II prohibitions is found in 42 C.F.R. Part 411, especially § 411.353. This regulation also requires that any entity collecting payment for a service "performed under a prohibited referral must refund all collected amounts on a timely basis." § 411.353.

was an FCA violation). Relator points to the legislative history of the 1986 FCA amendments and contends that Congress understood *Peterson* to mean that "a false claim for reimbursement under the Medicare, Medicaid or similar program is actionable under the act," and that "all Medicare claims submitted on behalf of a physician who is ineligible to participate in the program" are "false and actionable under the act." S.Rep. No. 99–345, 1986 U.S.Cong.Code & Ad.News at 5274–75. In *Peterson,* Zodiac Enterprises, Inc. ("Zodiac"), a corporation wholly owned by the defendant James E. Peterson, brother of defendant Dr. Donald M. Peterson, provided physical therapy services to patients. Because these services were provided to a nursing home facility also controlled by James Peterson, and thus a related company under the regulation, Zodiac could not directly submit Medicare bills, so it submitted through Dr. Donald Peterson's office 120 claims for these services and falsely certified that they were performed by a physician or were incident to a physician's service. The district court found that each of the 120 claims violated the FCA. The Petersons' defense is the same argument advanced by the Columbia Defendants here: there was no violation of the FCA because the services were performed by qualified people, the patients receiving these services were entitled to them under Medicare, the monies paid by the government were thus a liability that it was statutorily required to pay, and therefore there was no financial loss to the government.

On appeal, Relator emphasizes, the Fifth Circuit rejected this argument as "unsound." Whether the services were reasonable, necessary or provided to qualified recipients entitled to the services was immaterial for FCA analysis because they were not covered or payable under the Medicare Act. Thus, argues Relator, because the services were provided in circumstances where the provider could not have been paid if it had submitted a bill, *Peterson* stands for the proposition that submission of claims for services that were statutorily ineligible for payment under the applicable Medicare Act is a "false claim" within the ambit of the FCA. 508 F.2d at 52,

quoting *United States v. Neifert–White Co.,* 390 U.S. at 233, 88 S.Ct. 959.

Relator analogizes that just as the physical therapy claims in *Peterson* were false because they were not payable under the Medicare Act to the provider that submitted the bill, the claims and bills presented by Columbia in violation of the Stark laws are false or fraudulent because they cannot be lawfully paid. Dr. Peterson requested payment for each false claim from Medicare knowing he was not entitled to it; so do Columbia Defendants submit claims and bills in violation of the Stark laws with the knowledge that they are not entitled either to submit or receive payment of those claims or bills. Thus the Columbia Defendants also violate the FCA and, like James Peterson and Zodiac, "end[ ] up obtaining Government funds to which they were not entitled." 508 F.2d at 54.

Relator further contends that Columbia Defendants misconstrue *Equifax,* 557 F.2d 456, which involved the government's employment of Equifax, Inc. to gather business information in violation of the Anti–Pinkerton Act, 5 U.S.C. § 3108 (1970). Relator Weinberger alleged that Equifax's billing of the United States for those services violated the FCA, then codified at 31 U.S.C. §§ 231–32 (1970). 557 F.2d at 458. Relator distinguishes *Equifax* from the situation here on the grounds that in *Equifax* there was nothing unlawful in the defendant's billings or services that would have prevented payment under the government contract involved. *Id.* at 460. Nor did the Anti–Pinkerton Act prohibit Equifax from submitting bills or being paid for services even if its employment violated the statute or conditioned the contractors' access to government funds upon compliance with any statutory condition. In contrast, here the situation is like that Congress indicated would give rise to a false claim, i.e., where "the government made it clear [in subsection (g)(1) of the Stark Acts] that it would not [pay Stark violators] when it contracted for [Medicare] work". 557 F.2d at 461. A contractor's claim for payment in violation of a statute that is central to its right to receive payment or that conditions its privilege to participate in the government program is a false claim. *Id.* Thus, *Equifax,*

to the extent that it has any bearing on the false claim, as opposed to false statement or certification, aspect of this case, supports Relator's position, he maintains.

Columbia Defendants' charge that the complaint does not allege that "the government was required to pay out more on the Hospitals' claims for reimbursement than it would have if there had been no violation of the Stark laws" fails to address the Stark automatic prohibition of payment. In effect they argue that the government and Relator cannot maintain a *qui tam* action because the government would have paid for Medicare services if the services had been provided to those patients by other providers. The correct analysis would be that whatever right Medicare patients may have had to receive such services, Columbia was not entitled to receive payment from the government because it violated the Stark Act proscriptions in obtaining patients and performing services. *Peterson* makes clear that the dispositive issue for an FCA claim is whether the particular provider who billed for the services was entitled to receive payment, not whether somebody else would be entitled to compensation if he had performed the services. In sum, Relator asserts, Columbia's self-referral and kickback system ensured that no Medicare money could legally be paid to it, and all money that was paid by the United States to Columbia constitutes "damages" to the government because the public Treasury was not obligated or liable to pay anything to Columbia. Thus Columbia's argument that the submission of claims by Columbia is not actionable because there is no pecuniary injury to the United States is erroneous.

Furthermore, insists Relator, pecuniary loss is not an element of an FCA cause of action. *Rex Trailer Co. v. United States,* 350 U.S. 148, 76 S.Ct. 219, 100 L.Ed. 149 (1956) (explicitly rejecting argument that a pecuniary injury has to be shown as a condition to recovery); *United States v. Ridglea State Bank,* 357 F.2d 495, 497 (5th Cir.1966); *United States ex rel. Schwedt v. Planning*

*Research Corp.,* 59 F.3d 196, 198 (D.C.Cir. 1995); *United States ex rel, Hagood v. Sonoma Co. Water Agency,* 929 F.2d 1416, 1421 (9th Cir.,1991); *United States v. Rohleder,* 157 F.2d 126 (3d Cir.1946) (relied on by Fifth Circuit in *Ridglea State Bank* and holding that FCA claimant need not show that government would have saved money if required competitive bidding procedures had been followed); *United States ex rel. Pogue v. American Healthcorp., Inc.,* 914 F.Supp. 1507, 1508–09 (M.D.Tenn.1996) ("[T]he False Claims Act was intended to govern not only fraudulent acts that create a loss to the government but also those fraudulent acts that cause the government to pay out sums of money to claimants it did not intend to benefit"); *United States v. Kensington Hosp.,* 760 F.Supp. 1120, 1126 (E.D.Pa.1991); *United States ex rel. Walle v. Martin Marietta Corp.,* No. 92–3677, 1997 WL 4566 at *1 (E.D.La.1997).[20] The government sustains injury whenever a disqualified person seeks compensation for services which that individual or entity is statutorily precluded from receiving, regardless of whether the amount of that loss can be monetarily quantified in traditional damages terms. Congress has determined that the Medicare system requires protection from illegal remuneration, kickbacks, misrepresentations, and wrongful payments and the peril to the program and to the public fisc that this conduct presents. *Hanlester Network v. Shalala,* 51 F.3d 1390, 1401–02 (9th Cir.1995).

Moreover, Relator asserts that even the Columbia Defendants accept that the pecuniary injury element is satisfied by the government's investigative and administrative costs caused by violations of the Stark Act and the Medicare Anti–Fraud Act. Relator points out that the Supreme Court has made clear that other expenditures of government funds in addition to those wrongfully paid to a claimant are sufficient to underlie an FCA cause of action. *See also United States v. Halper,* 490 U.S. at 445, 109 S.Ct. 1892 (recognizing that where FCA forfeitures were allowed for numerous projects on which no actual pecuniary loss had been incurred, the government's

**20.** Relator observes that even in the absence of actual damages, an FCA plaintiff is entitled to recover on behalf of the government civil penalties of between $5,000 and $10,000 per violation and costs of court. 31 U.S.C. § 3729(a).

"injuries, of course, included not merely the amount of the fraud itself, but also ancillary costs, such as the costs of detection and investigation, that routinely attend the Government's efforts to root out deceptive practices directed at the public purse."). *Halper* also noted that in *Rex Trailer* the Supreme Court could have included the government's investigative and prosecutorial costs in assessing the government's loss. 490 U.S. at 446 n. 6, 109 S.Ct. 1892. In *Ridglea State Bank*, the Fifth Circuit also observed "that the investigation necessary to detect a false claim costs the Government money even if no money is paid on the claim." 357 F.2d at 497. Thus Relator contends that the investigative costs incurred here also constitute ample injury to state a claim for relief for Rule 12(b)(6) purposes.

Relator also argues that statutory FCA penalties, by way of forfeitures, are recoverable even without actual damages to the government. The Senate Committee reported that the "forfeiture is automatic and mandatory for each claim which is found to be false. The United States is entitled to recover such forfeiture solely upon proof that false claims were made, without proof of any damages." S.Rep. No. 99–345, 1986 U.S.Cong.Code & Ad.News at 5273, *citing Fleming v. United States*, 336 F.2d 475, 480 (10th Cir.1964), *cert. denied*, 380 U.S. 907, 85 S.Ct. 889, 13 L.Ed.2d 795 (1965). The Fifth Circuit has also determined that while the statute requires the government to show causation between the false statements and the loss before it can recover double damages, where a complaint does not allege damages to the government it still states a claim for recovery of the forfeiture penalty. *United States v. Miller*, 645 F.2d 473, 475–76 and n. 4 (5th Cir.1981) ("as to the forfeiture, the knowing submission of a false claim to the government is sufficient for the levying of the statutory forfeiture penalty"). In *Ridglea State Bank*, 357 F.2d at 497, the Fifth Circuit flatly rejected the argument that no FCA cause of action is stated if the government has not incurred actual damages by paying money on a false claim and cited *U.S. v. Rohleder*, 157 F.2d 126 (1946), for the proposition that "proof of actual damage is not a prerequisite to the recovery of a forfeiture" under the

FCA. *See also United States ex rel. Marcus v. Hess*, 317 U.S. 537, 63 S.Ct. 379, 87 L.Ed. 443 (1943) (affirming district court decision allowing forfeitures for public works projects for which no damage had been incurred). The Columbia Defendants fail to appreciate this central difference between FCA damages and penalties and the fact that the mere presentation of Columbia's Medicare claims for patients referred in violation of the Stark laws gives rise to civil penalty liability under the FCA where that presentation is explicitly prohibited by § 1395nn(a)(1), for a claim that the defendant knows he is unauthorized to present because it is false, fictitious, and fraudulent. *Dimmick v. United States*, 116 F. 825, 828 (9th Cir.1902), *cert. denied*, 189 U.S. 509, 23 S.Ct. 850, 47 L.Ed. 923 (1903), *quoted in Kercher v. United States*, 409 F.2d 814, 818 (8th Cir.1969). Moreover, the second amended complaint states a claim for civil penalties even if it has not alleged actual, concrete financial loss to the United States.

Relator turns to his second claim for violation of the FCA, Columbia's false certifications of compliance on HCFA form 2552. He maintains that in light of the Fifth Circuit's holding on appeal, now the law of the case, Columbia Defendants are barred from contesting the sufficiency of the claim and the Court should summarily deny the pending motion to dismiss. 125 F.3d at 902–03 (denying Rule 12(6)(b) motions as they relate to certification issue and remand for further factual development).

Relator charges that Columbia's false certifications of compliance on HCFA form 2552 cost reports, which Columbia is required to file with the Department of Health and Human Services ("HHS"), violate the FCA because they are a condition to Columbia's *retention* of funds previously received. The government pays Medicare claims prospectively, while the form 2552 certifications are submitted after payment has already been made. Columbia therefore insists that no FCA violation has occurred because "the submission of a truthful certification of compliance ... was not a prerequisite to the government's payment of Medicare claims." Columbia Defs.' Brief at 7. Relator asserts

that Columbia Defendants misrepresent the Medicare claim process. The form 2552 cost reports are promulgated by the Secretary of HHS pursuant to the authority of 42 U.S.C. § 1395g. Section (a) of that statute governs payments to providers of Medicare services:

> The Secretary shall periodically determine the amount which should be paid under this part to each provider of services with respect to the services furnished by it, and the provider of services shall be paid ... except that no such payments shall be made to any provider unless it has furnished such information as the Secretary may request in order to determine the amounts due such provider under this part for the period with respect to which the amounts are being paid or any prior period.

42 U.S.C. § 1395g (1992).

Form 2552,[21] furthermore, expressly states the consequences of a failure or refusal to certify:

> This report is required by law (42 U.S.C. § 1395g; 42 C.F.R. 413.20(b)). Failure to report can result in all interim payments made since the beginning of the cost report being deemed overpayments. (42 U.S.C. § 1395g).

In addition, the regulations implementing Stark II expressly require that any entity collecting payment for a service "performed under a prohibited referral must refund all collected amounts on a timely basis." 42 C.F.R. 411.353.

Thus, sums up Relator, certification of compliance on form 2552 is an absolute condition precedent to retaining the Medicare funds conditionally advanced by the government, not to mention a prerequisite to continued future participation in the program. Without such certification, under the Stark law statute Columbia could be required to forfeit all of interim Medicare payments previously made. Furthermore, Columbia's false certification of compliance additionally violates subsection (a)(7) of the FCA. Section 3729(a)(7) imposes liability on any person who

> knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government.

31 U.S.C. § 3729(a)(7) (Supp.1998). Relator argues that the amended complaint essentially indicates that Columbia's false certification was made to conceal its obligation to refund all the amounts it had collected or to avoid or decrease its fixed obligation to transmit that money to the government.[22]

Contesting Columbia's assertion that the form 2552 "is neither the cause in fact of the government's payment of benefits nor a proximate cause of any injury to the Treasury that the FCA is designed to remedy," Relator points out that the false record or statement portion of the FCA is written in the disjunctive and that liability arises when

---

**21.** The certification contained in Form HCFA–2552 reads as follows:

MISREPRESENTATION OR FALSIFICATION OF ANY INFORMATION CONTAINED IN THIS COST REPORT MAY BE PUNISHABLE BY CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINE AND/OR IMPRISONMENT UNDER FEDERAL LAW. FURTHERMORE, IF SERVICES IDENTIFIED BY THIS REPORT WERE PROVIDED OR PROCURED THROUGH THE PAYMENT DIRECTLY OR INDIRECTLY OF A KICKBACK OR WHERE OTHERWISE ILLEGAL, CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINDS, AND/OR IMPRISONMENT MAY RESULT.

 CERTIFICATION BY OFFICER OR ADMINISTRATOR OF PROVIDER(S)

 I HEREBY CERTIFY that I have read the above statement and that I have examined the accompanying electronically filed or manually submitted cost report and the Bal-

ance Sheet and Statement of Revenue and Expenses prepared by ... (Provider Name(s) and Number(s)) for the cost reporting period beginning ... and ending ... and that to the best of my knowledge and belief it is a true, correct and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as noted. I further certify that I am familiar with the laws and regulations regarding the provision of health care services and that the services identified in this cost report were provided in compliance with such laws and regulations.

**22.** Relator now seeks to amend the complaint to allege this violation more specifically and to assert that Columbia's continuing false certification on form 2552 cost reports for calendar years 1995, 1996 and 1997 after this suit was filed.

a person uses a false statement to get a false or fraudulent statement either "paid or *approved* by the government." 31 U.S.C. § 3729(a)(2) (emphasis added). While the cost forms may not need to be submitted by Columbia to obtain the initial provisional payment, the government's final approval of those interim payments is expressly conditioned upon provision of the certification in both section 1395g and on the face of the HCFA form 2552. Furthermore, interim payments are subject to retroactive adjustments, the first of which is made as soon as the annual cost report is filed. *United States v. Gravette Manor Homes, Inc.*, 642 F.2d 231, 233 (8th Cir.1981). The "nexus" between the certifications and Columbia's entitlement to payment is clear and the falsity of the submitted forms constitutes a violation of the FCA.

Relator argues that despite Columbia's reliance on *Hopper*, 91 F.3d 1261, the case supports his position more than Columbia's. In that case the court rejected the plaintiff's claim that submission of a certificate to the California Department of Education certifying that the school district in the future would meet all applicable requirements of state and federal law and regulations, including general compliance with the individuals With Disabilities Education Act, violated the FCA. The court emphasized that such certificates of assurance were not a prerequisite to the school district's receipt of federal funds. In contrast, Relator contends, both 42 U.S.C. § 1395g and its implementing form, HCFA form 2552, make certification of compliance here a prerequisite for federal funds. Relator also distinguishes the facts here from those in *Hopper* by noting that here the HCFA cost forms require Columbia to certify that the services were provided in the past in compliance with applicable health care laws and regulations, while in *Hopper* the general assurances were that the district would comply with applicable federal law in the future. A promise to do something in the future is not false unless at the time it was made the promisor had no intent to perform it. Thus *Hopper* dealt with a false certification claim as promissory fraud, rather than misrepresentation of a past or present existing fact. No cause of action exists

under the FCA for a breached promise that was not false when it was made.

Relator also observes that the false certifications enabled Columbia to continue participating in the Medicare program, despite its violations of the Stark laws and the Medicare Anti–Fraud and Abuse Act. Had Columbia disclosed to the Secretary of the HHS the existence of the illegal kickback, self-referral, and remuneration schemes alleged in the second amended complaint, under the Medicare exclusion statute, 42 U.S.C. § 1320a–7 (Supp. 1996), the Secretary has the authority to exclude from any Medicare program any entity "that the Secretary determines has committed an act which is described in section ... 1320a–7b of this title." 42 U.S.C. § 1320a–7(b)(7) (1991 and Supp.1996). Thus Columbia could be excluded from participating in any Medicare program if it disclosed the illegal remuneration amendment prohibited by § 1320a–7b(b)(2)(A) and also for violating § 1320a–7b(c), which prohibits the making or causing to be made, or the inducing or seeking to induce the making of, any false statement or representation of material fact with respect to the conditions or operation of any institution, facility, or entity in order that it may qualify as an eligible Medicare provider.

Since § 1395g prohibits the Secretary from making any payments to Medicare providers unless and until they have furnished such information as the Secretary may require, Columbia's receipt of Medicare payments for each year after 1994 was the result of its false certifications of compliance because otherwise it would not have been permitted to participate or receive payments for each subsequent year and the government would not have paid to Columbia the money that is the basis of this suit. *Equifax*, 557 F.2d at 461 (identifying as a false claim a material misrepresentation knowingly made in order to qualify for a government contract, privilege, or service).

Courts have found FCA violations based on comparable misrepresentations. *United States v. Oakwood Downriver Medical Center*, 687 F.Supp. 302, 303–04 (E.D.Mich.1988) (holding that an FCA claim arose out of

defendant's failure to disclose in its form 2552 cost reports the existence of prohibited transactions with related health care organizations); *Hopper*, 91 F.3d at 1266 (false certification of compliance to obtain a government benefit creates liability irrespective of any underlying fraudulent activity), *citing* Biese, *Civil False Claims and Qui Tam Actions*, 1–29 to 1–30 (1995), and *United States ex rel. Fallon v. Accudyne Corp.*, 880 F.Supp. 636, 638 (W.D.Wis.1995) (refusing to dismiss FCA claim based on defendant's alleged knowing false representations, certifications and claims that it had complied with governmental environmental regulations to induce payment under its government contracts).

As another, independent violation of the FCA besides violation of the Stark laws, Relator maintains that Columbia's Medicare claims violated the Medicare Anti–Fraud and Abuse statute, 42 U.S.C. § 1320a–7(b) (Supp. 1996), as the product of physician referrals of Medicare patients induced through the payment of at least ten kinds of illegal remuneration. Columbia Defendants claim that the Fifth Circuit affirmed the dismissal of Relator's claims of violations of the Medicare Anti–Fraud and Abuse statute, but Relator disagrees. The appellate court state, "We agree with the district court that claims for services rendered in violation of a statute do not *necessarily* constitute false or fraudulent claims under the FCA," leaving room for them to violate the FCA under certain circumstances. *Thompson*, 125 F.3d at 902 (emphasis added). It did not conclude that violations of the statute fail to state a claim under Rule 12(b)(6). The sole aspect of this Court's order that was affirmed was the ruling that the second amended complaint failed to satisfy Rule 9(b) in alleging the provision of medically unnecessary services. After reviewing *Thompson*, this Court agrees with Relator.

In *United States ex rel. Pogue v. American Healthcorp.*, 914 F.Supp. 1507, 1508–10 (M.D.Tenn.1996), the relator argued that participation in any federal program involves an implied certification that the participant will obey all rules, statutes and regulations governing the program so that submitting claims for payment without such compliance constitutes submission of fraudulent claims in violation of the FCA. The plaintiff specifically insisted that even in the absence of an allegation that the defendants overcharged Medicare or charged it for services not rendered, their failure to comply with Medicare laws prohibition kickbacks and self-referrals rendered the Medicare claims submitted false or fraudulent. He also alleged that the government would not have paid the claims had it known of the alleged kickback and self-referral violations, which defendants implicitly had therefore concealed to defraud the government. Relator makes the same claim in his proposed third amended complaint. The *Pogue* court, finding support in the legislative history of the 1986 amendments to the FCA, determined that the relator had stated a claim for relief under the FCA and that "each and every claim submitted under a contract, loan guarantee or other agreement, which was originally obtained by means of false statement or other corrupt or fraudulent conduct or in violation of any statute or applicable regulation, constitutes a false claim." 914 F.Supp. at 1513, *quoting* S.Rep. 99–345, 1986 U.S.Code Cong. & Ad.News at 5274. The *Pogue* court concluded that the FCA "was intended to govern not only fraudulent acts that create a loss to the government but also those fraudulent acts that cause the government to pay out sums of money to claimants it did not intend to benefit." *Id.* Relator points out that the same scheme to defraud through concealment of illegal remuneration paid by Columbia to its affiliated physicians and institutions to induce Medicare referrals is asserted here. Had the scheme been disclosed, Columbia would have been disqualified from participation in any Medicare program and would not have obtained Medicare payments to which it was not entitled. Both results support a claim for relief on behalf of the United States under the FCA. *United States ex rel. Roy v. Anthony*, 914 F.Supp. 1504, 1506 (S.D.Ohio 1994) (refusing to dismiss *qui tam* claims against physicians and medical imaging companies under the FCA for activity violation the Medicare Fraud and Abuse statute where the relator could produce evidence showing that the kickbacks rendered the

claims for payment constructively false or fraudulent).

Relator contends that *Pogue's* analysis is correct. It is the only interpretation of the FCA that gives proper weight to the policies underlying its enactment and the express legislative purpose of the amendments that govern this case. As in *Pogue,* Columbia Defendants here have concealed the existence of their pervasive illegal remuneration arrangements from the government to obtain Medicare payments to which they were not entitled from the beginning or have illicitly retained their qualification to continue participation in the Medicare program. Both results entitle the United States to relief under the FCA. *United States ex rel. Roy v. Anthony,* 914 F.Supp. at 1506.

Relator also insists that he has satisfied Rule 9(b) pleading requirements, but if the Court determines that the second amended complaint is deficient, he requests leave to amend.

Columbia Defendants argue that the parent entities, Columbia/HCA Healthcare Corporation and CHC Holdings, Inc., should be dismissed because Columbia is liable for the misconduct of the remaining Defendants. Relator objects, noting that his second amended complaint alleges that Columbia/HCA Healthcare Corporation owned or controlled the healthcare providers that submitted the Medicare claims in violation of the FCA, that the holding company is a wholly owned subsidiary, that all Columbia Defendants have induced referrals of Medicare patients in violation of 42 U.S.C. § 1320a–7b, that since October 1990 they have accepted Medicare referrals prohibited by the Stark laws and submitted claims to Medicare for these patients in violation of the statutes, and that all knowingly made, used or caused to be made or used a false record or statement to get a false or fraudulent claim paid or approved and caused false claims to be presented in violation of the FCA.

Relator emphasizes that the FCA imposes liability on both a person or entity that actually presents a false claim and on an entity that causes a false claim to be presented or causes a false record or statement to be made or used. 31 U.S.C. §§ 3729(a)(1), (a)(2), and (a)(7). Relator alleges that the parent companies were directly involved and asserted control, and they are liable for having caused their subsidiaries to engage in the pervasive and systematic submission of claims in violation of the Stark laws and the Medicare Anti–Fraud & Abuse Act. Where Relator could prove such facts, dismissal on the pleadings is erroneous. *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984).

Alternatively, as another basis for imposing liability on Columbia Defendants, Relator points to Texas law supporting the piercing of a corporate veil under three theories, i.e., when (1) the corporation is the alter ego of its owners or shareholders, (2) the corporation is used for illegal purposes, or (3) the corporation is used as a sham to perpetrate a fraud. *Capital Parks, Inc. v. Southeastern Advertising and Sales System, Inc.,* 30 F.3d 627, 629 (5th Cir.1994). He maintains that the second amended complaint alleges the systematic commission of illegal acts by the Columbia parent companies, through their subsidiary operating entities, thus stating a claim against the parent companies for using subsidiary entities for illegal purposes.

Relator also maintains that the allegation that the illegal schemes were designed, promoted and implemented by the parent Columbia entities is sufficient to state a separate claim for alter ego liability. He argues, however, that the United States is not required to plead its alter ego allegation with Rule 9(b) specificity. Rather general allegations of dominion and control are adequate to avoid dismissal of alter ego claims on the pleadings. *In re Harvard Knitwear, Inc.,* 153 B.R. 617, 626 (Bkrtcy.E.D.N.Y.1993). An alter ego exists where a corporation is operated and organized as a mere tool or business conduit of another corporation. *Watkins v. Black & Decker (U.S.), Inc.,* 882 F.Supp. 621, 626 (S.D.Tex.1995); *Western Horizontal Drilling, Inc. v, Jonnet Energy Corp.* 11 F.3d 65, 68 (5th Cir.1994). Texas law regards the control of management or operations by the parent as sufficient evidence of an alter ego relationship. *Id., citing Gentry v. Credit Plan Corp. of Houston,* 528 S.W.2d 571, 573 (Tex.1975). Relator insists

that his allegation that the Columbia parent corporations controlled the operations of the other Columbia Defendants withstands Defendants' Rule 12(b)(6) challenge. An examination of an alleged alter ego relationship is a fact-intensive analysis, inappropriate for a Rule 12(b)(6) analysis, Relator maintains.

Furthermore, Relator notes, courts have consistently found that where allegations of fraudulent conduct are numerous or take place over an extended period of time, less specificity is required to satisfy the pleading requirements of Rule 9(b). *Sunbird Air Services, Inc. v. Beech Aircraft Corp.,* 789 F.Supp. 364, 366 (D.Kan.1992); *Fujisawa Pharmaceutical Co. v. Kapoor,* 814 F.Supp. 720, 726 (N.D.Ill.1993). Where the course of conduct occurs over an extended time period or consists of a series of transactions, the plaintiff need not allege in detail the facts of each transaction of the fraudulent scheme. *Bale v. Dean Witter Reynolds, Inc.,* 627 F.Supp. 650, 652 (D.Minn.1986). The ongoing scheme alleged here is a course of fraudulent conduct beginning as early as 1990 and involving probably thousands of Medicare claims. Thus far no discovery has been allowed because of the two-and-one-half-year stay imposed by the Court, although discovery is necessary for identification of each invalid claim submitted by Columbia Defendants. Relator also urges that the Fifth Circuit has recognized that Relator was only required to allege the "who, what, when, where, and how" of the alleged fraud. *Thompson,* 125 F.3d at 903.

Furthermore, the Fifth Circuit has recognized that a relaxed pleading requirement was appropriate, "allowing fraud to be pled on information and belief where, as here, the facts relating to the alleged fraud are peculiarly within the perpetrator's knowledge." *Id.* at 903; *Tuchman v. DSC Communications Corp.,* 14 F.3d 1061, 1067–68 (5th Cir. 1994); *In re Catfish Antitrust Litigation,* 826 F.Supp. 1019, 1029–30 (N.D.Miss.1993). Moreover, an exception to the particularity requirement of Rule 9(b) in cases of corporate fraud where the plaintiff cannot be expected to have personal knowledge of the facts constituting the wrongdoing. *Wool v. Tandem Computers, Inc.,* 818 F.2d 1433,

1439 (9th Cir.1987). Rule 9(b) permits allegations of fraud to be based on information and belief when the facts are within the opposing party's knowledge, and Relator states that he has specified in factual detail the precise nature of illegal remuneration, kickback, and self-referral arrangements that caused the providing and submission of fraudulent claims to further the physicians' self-interest. *Scheidt v. Klein,* 956 F.2d 963, 967 (10th Cir.1992).

Relator points to two cases that considered the pleading sufficiency under Rule 9(b) of FCA claims arising from the submission of Medicaid claims tainted by kickbacks. In *United States v. Kensington Hospital,* 760 F.Supp. 1120, 1125 (E.D.Pa.1991), the court found the pleadings sufficient where the plaintiff identified the time periods during which the alleged fraud occurred, the different clinics involved, and the specific types of kickbacks received. In the second decision in *United States ex rel. Pogue v. American Healthcorp, Inc.,* 977 F.Supp. 1329, 1332–33 (M.D.Tenn.1997), where the complaint was similarly worded to that here, the court determined that the fourth amended complaint, which alleged that between 1984 and 1996 a defendant entered into a series of incentive-based contracts with the other defendants for payment in exchange for referrals, sufficiently pled a scheme to defraud the United States of Medicare and Medicaid funds, even though no specific dates or employees were identified. Relator insists that he has provided Defendants with ample notice and information for them to frame a response and that their motion under Rule 9(b) should be denied.

In its initial response only, Relator asserted that fraud, a broader cause of action than misrepresentation, may be acted as well as spoken, and may be defined as "the successful employment of cunning deception or artifice to circumvent or defraud another to his injury." *Johnson v. Smith,* 697 S.W.2d 625, 632 (Tex.App.—Houston [14th Dist.] 1985, no writ); *Houston Oilers, Inc. v. Neely,* 361 F.2d 36, 41 (10th Cir.1966), *cert. denied,* 385 U.S. 840, 87 S.Ct. 92, 17 L.Ed.2d 74 (1966); *First State Bank of Miami v. Fatheree,* 847 S.W.2d 391, 394–96 (Tex.App.—Amarillo

1993, writ denied); *Texas Oil & Gas Corp. v. Hagen,* 683 S.W.2d 24, 30 (Tex.App.—Texarkana 1984, no writ), op. withdrawn and judgment vacated as moot, 760 S.W.2d 960 (Tex. 1988); *Kunz v. Huddleston,* 546 S.W.2d 685, 690 (Tex.Civ.App.—El Paso, 1977, writ ref'd n.r.e.). Therefore, contends Relator, where the essence of Columbia's fraudulent submission of Medicare claims was its conduct rather than any specific representations, a Rule 9 standard governing misrepresentation does not apply.

In conclusion, Relator again emphasizes that he has stated at least three separate claims for relief under the FCA, that Columbia Defendants have not shown they are entitled to summary judgment under Rule 56 nor produced summary judgment evidence, and that he has not had an opportunity to conduct discovery so the motion to dismiss should not be converted into a motion for summary judgment. He requests leave to amend his complaint to allege additional and continuing violations of the FCA by the Columbia Defendants and permission to conduct discovery.

In the related motion, Plaintiff *ex rel.* James M. Thompson moves for leave to amend his complaint to conform to the Fifth Circuit's opinion, to update his factual allegations, and to clarify those allegations and provide additional supporting statutory citations. Plaintiff last amended his complaint in 1995.

Defendants object that the proposed third amended complaint simply repeats most of the second with minor variations, with a new claim under the reverse false claims provision of the FCA, 31 U.S.C. § 3729(a)(7).[23] The last alleges that the hospitals' false certifications in filing their cost reports were made to avoid having to disgorge payments that they previously received under Medicare's prospective payment system. Defendants suggest this claim is a response to the Relator's erroneous understanding of Defendants' motion to dismiss, i.e., his belief that

Defendants are arguing that because the government pays a Medicare claim prospectively, before the cost reports are filed, the certification cannot be a prerequisite to payment of those claims. Defendants state they are not arguing about the timing of the payment as dispositive of the issue on remand, i.e., whether a truthful certification or the cost report is a prerequisite to payment. Defendants maintain that under the regulations such certifications are not made a prerequisite to the payment or retention of funds and therefore the proposed amendment would be futile and should be denied. *Emory v. Texas State Board of Medical Examiners,* 748 F.2d 1023, 1027 (5th Cir.1984). Finally, the last paragraph of the proposed third amended complaint conclusorily alleges that the "managing officers and directors" of Columbia/HCA and CHC Holdings "caused" the hospitals to violate the anti-kickback and Stark laws and are therefore liable under the FCA. Alternatively, the proposed pleading alleges that Columbia/HCA and CHC Holdings "structured, established and utilized" the hospitals as "conduits" for alleged violations. Defendants criticize these additions for lack of specific factual allegations and argue that legal conclusions, such as that the entities "caused" or were "conduits" for alleged violations is insufficient to state a claim. *Fernandez–Montes v. Allied Pilots Ass'n,* 987 F.2d 278, 284 (5th Cir.1993) ("[L]egal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss"). In sum, because Relator's amended pleading will not cure his deficiencies in failing to state a claim, it will be futile, and therefore leave to amend should be denied.

Finally, the Court reviews the *amicus curiae* brief filed by the United States in opposition to the motion to dismiss and the Columbia Defendants' reply. In that brief, the government explains in great detail, which the Court will not repeat but to which it refers the parties, the purposes of preventing

---

**23.** Section 3729(a) provides for liability for a person who "knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(7). Defendants argue that this provision in the FCA was intended by Congress to reach all attempts to cheat the government out of money, whether the government owed the money or the money was to be paid to it. Jack T. Boese, *Civil False Claims and Qui Tam Actions,* Ch. 2 § 7 (1998 Supp.).

and punishing medicare fraud behind each of the relevant statutes and the steps in the processing of Medicare claims by medical providers

Taking the facts alleged by Relator as true, the *amicus curiae* brief [24] argues that Relator's second amended complaint states several viable causes of action under the FCA and essentially reiterates Relator's arguments. The Court will not repeat the cited authority already discussed, but merely summarize the government's points.

First, it insists that Columbia Defendants violated 31 U.S.C. § 3729(a)(1) by submitting claims that were false because they contained false certifications of compliance with applicable Medicare statutes and regulations, including the Anti-Kickback statute and the Stark laws. The government emphasizes that Columbia's own brief, at 12, reflects that it submitted false certifications with its cost reports. The government submits a declaration of David A. Goldberg, Acting Chief of HHS' Health Care Financing Administration (previously referred to as "HCFA"), who worked in the Medicare Program at HHS since 1973, as exhibit 1 to the *amicus curiae* brief. Goldberg's declaration, "based upon my personal knowledge, upon information contained in agency files, upon information furnished by Medicare contractor staff, and upon information furnished to me by my staff," at 2, provides a supporting, detailed description of the HCFA procedures in paying out Medicare claims. Regarding the required HCFA–2552 form, which must be submitted by hospitals, Goldberg, after observing that HCFA periodically revises the form, states, *id.* at 8–11,

22. Every Hospital Cost Report contains a "Certification," which must be signed by the chief administrator of the provider or a responsible designate of the administrator....

23. For cost reporting periods prior to approximately 1992, the certification provision in the Hospital Cost Report requires the responsible provider official to certify, in pertinent part, that "to the best of my knowledge and belief, [the Hospital Cost Report] is a true, correct and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as noted." Copy of Form HCFA–2552–85 attached hereto as Exhibit B. That form also states that "intentional misrepresentation of any information contained in this cost report may be punishable by fine and/or imprisonment under federal law." Exhibit B.

24. As to cost reports for years after approximately 1991, the certification provision of the Hospital Cost Report was altered to include the following sentence: "I further certify that I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations. Se page 6–1 of Exhibit A. That form was also changed to stat: "Misrepresentation or falsification of any information contained in this cost report may be punishable by criminal, civil and administrative action, fine and/or imprisonment under federal law. Furthermore, if services identified in this report were provided or procured through the payment directly or indirectly of a kickback or where otherwise illegal, criminal, civil and administrative action, fines and/or imprisonment may result."

25. The "applicable instructions" contained in the pre–1992 certification included the requirement that the services described in the cost report complied with Medicare program requirements, including the provisions of outlawing kickbacks.

26. The certification starting in 1992 made more explicit the preexisting requirement that the provider certify that the services in the cost report complied

**24.** Although the United States chose not to intervene in this *qui tam* action, it states that it retains an interest in this suit because it will receive at least 70% of any recovery obtained by Relator through settlement or judgment and because any precedent set by this Court may shape future enforcement of the statute. 31 U.S.C. § 3730(d); 28 U.S.C. § 517 (providing for Department of Justice participation in any federal court litigation to attend to the interests of the United States). The government explains with supporting statistics that the FCA is its primary tool to recover vast sums lost to the Treasury and the Medicare Trust Fund due to healthcare fraud.

with the Medicare laws, regulations, and program provisions, including the provisions outlawing kickbacks.

27. Under both versions of the certification, HCFA understood that the certifier was representing that the services provided in the cost report were not infected by a kickback.

28. HCFA views any false statement contained in a cost report as constituting an abuse of the Medicare program.

29. HCFA conditions both payment and provider eligibility on the veracity of the statements in the cost report.

30. HCFA considers any cost report containing a false statement to be invalid.

Declaration of David Goldberg at 8–11, Ex. 1 to amicus curiae brief. Thus Relator insists that Columbia's submission of the certification on Form HCFA 2552 was an essential condition of the government's allowance of the amounts claimed in the cost reports and provider eligibility. He makes clear that falsity, inaccuracy or incompleteness of the certifications invalidated the entire cost report and any amounts claimed in it. While the providers receive interim payments for services rendered during a year, these payments are conditional and the right to retain them is not determined until the hospital's cost report is submitted, reviewed, audited, and approved and the settlement of amounts owed to or by Medicare is made. Moreover, the cost report certifications submitted before and after 1992 are the same despite the different language used in the latter because HCFA interprets the phrase, "applicable instructions," to encompass Medicare program requirements. It further states that there is no merit in Columbia's allegation that its earlier cost reports do not contain a false certification because the Form HCFA–2552 itself warns that failure to correctly certify the cost report may result in civil, criminal, or administrative action under federal law. The cost report and certification process is a self-policing mechanism that is critical to the national effort to prevent and remedy fraud and abuse in the public health care financing system, since the government can review only a small fraction of the claims submitted and therefore must rely on them. Thus the

Fifth Circuit's remand for a determination whether the government conditioned payment upon these certifications has been met and Relator has stated a claim under the FCA. Thompson, 125 F.3d at 902.

Second, as another issue on remand and as an independent basis for liability, the amicus curiae brief contends that Relator has stated a claim in alleging that Columbia Defendants violated 31 U.S.C. § 3729(a)(1) by submitting claims for payment in violation of the Medicare anti-referral statutes, the Stark laws, because they expressly prohibit payment for services rendered in violation of their terms. Thompson, 125 F.3d at 902. This incorporated prohibition is a firm nexus between the prohibited acts and payment by the government out of the Treasury that supports an FCA claim without the need for a separate certification of compliance.

Third, assuming that Columbia's claims for payment were false or fraudulent based on the alleged facts as discussed above, the government argues that Columbia is liable on a separate and independent ground of knowingly making a statement in order to get a false or fraudulent claim paid, in violation of 31 U.S.C. § 3729(a)(2). Thompson, 125 F.3d at 903. Indeed, the government maintains that Columbia Defendants are liable for false statements under § 3729(a)(1) and (a)(2) on the facts as alleged by Relator. The false statement is Columbia's certification in its Medicare cost reports that it complied with applicable laws and regulations when it did not. See also 42 U.S.C. § 1320a–7b(a) (providing criminal penalties for "making or causing to be made false statements or representations" in connection with furnishing items or services "for which payment is or may be made under the program").

The amicus curiae brief reiterates that it is established law that a showing of damages is not an essential element of an FCA cause of action. Even if there are no provable damages, liability for statutory civil penalties attaches when the provider submits a false claim for payment because false claims and false statements in support of claims harm government programs. A claim is "false or fraudulent" under the FCA when ever it misstates facts bearing on the claimant's en-

titlement to payment, regardless of whether the misstatement relates to the character or quality of the goods or services provided or the appropriateness of the price charged.

The government further insists that the *qui tam* provisions of the FCA are constitutional. Defendants' reliance solely on *Riley,* 982 F.Supp. 1261, which the government urges was decided incorrectly and is contrary to all prior authority from other federal courts, including the Fifth Circuit,[25] dooms their argument. Every federal appellate court that has considered the issue other than the *Riley* judge has upheld the *qui tam* provision. *United States ex rel. Roberts v. Lutheran Hospital,* Civil No. 1:97cv174 (N.D.Ind. Apr. 17, 1998), slip op. at 6 (Ex. B to *amicus curiae* brief); *Kelly,* 9 F.3d 743; *United States ex rel. Kreindler & Kreindler v. United Technologies Corp.,* 985 F.2d 1148 (2d Cir.), *cert. denied,* 508 U.S. 973, 113 S.Ct. 2962, 125 L.Ed.2d 663 (1993); *United States ex rel. Madden v. General Dynamics Corp.,* 4 F.3d 827 (9th Cir.1993). Numerous district courts have done the same, as discussed previously.

In response to the *amicus curiae* brief, Columbia Defendants argue that because the United States did not intervene in this action while it was under seal or since, in submitting the brief without prior court approval[26] the United States "has overstepped its bounds as an *amicus curiae* and as the real party in interest . . . and the Court should consider [the brief] merely as a statement of the United States' views on the legal issues. . . ." Furthermore, they maintain, the brief adds little. Columbia Defendants address two of its contentions: (1) that the hospitals' cost report certification of compliance with all applicable Medicare laws and regulations is a condition to the hospital's entitlement to payment of its Medicare claims; and (2) even without such compliance certification, the hospital's violation of the Medicare anti-kickback or Stark laws violates

the FCA upon submission of a cost report certifying that the amounts are accurate.

Regarding the first issue which was expressly remanded by the Fifth Circuit for this Court's determination, *Thompson,* 125 F.3d at 902–03, Columbia Defendants characterize David A. Goldberg's affidavit as "insufficient" to defeat their second amended motion because it represents only HCFA's view of the law. Not conceding that Goldberg's rendition of the practices and procedures relating to the cost report certifications are true without an opportunity to cross examine him or do discovery, Columbia Defendants say the substance of the declaration is irrelevant and incompetent in view of their showing that there is no legal authority[27] under which HCFA can condition payment of Medicare benefits on certification of compliance. *See United States v. Vernon Home Health, Inc.,* 21 F.3d 693, 695 (5th Cir.1994) (affidavit of government's expert that purchase of assets became liable for Medicare overpayments made to prior provider did not create fact issue, but were mere opinions about legal issues that the appellate court resolved de novo), *cert. denied,* 513 U.S. 1015, 115 S.Ct. 575, 130 L.Ed.2d 491 (1994). The real question, they argue, is whether HCFA can legitimately condition payments of benefits on the cost report certification. Supported by the authorities they have cited, Columbia Defendants insist they were entitled to payment for the services they provided to Medicare patients regardless of the truthfulness of the cost report certification and regardless of the position that HCFA says it would take on the issue, and they cannot be liable under the FCA for making a claim for payment.

Furthermore, they reiterate that most of the cost reports do not contain the certification; only two have it. Yet the United States asks this Court to find a certification where it does not exist, because of the statement that "HCFA views" a certification that a cost report "is a true, correct and complete statement prepared from the books

---

**25.** *Equifax,* 557 F.2d at 460.

**26.** The Court has since granted leave to file it retroactively and given all parties time to respond to the brief.

**27.** Defendants observe that the United States has not directed the Court to a single statute, regulation or case supporting Goldberg's interpretation of what the law is. The Court disagrees, noting Relator's discussion earlier of 42 U.S.C. § 1395g, 42 C.F.R. 413.20(b) and 411.353.

and records of the provider in accordance with applicable instructions, except as noted," a statement it equates with certification of compliance with Medicare anti-kickback and Stark laws. They maintain that certifying that a cost report accurately reflects the information in the hospitals' accounting records and presents it in the manner the instructions require is not the same as certifying compliance with the Medicare laws and regulations.

## COURT'S RULINGS

### A. Constitutionality of *Qui Tam* Provisions of the FCA

 As the threshold issue here, the Court addresses the question of the constitutionality of the *qui tam* provisions in the FCA and Judge's Hoyt's decision in *Riley*. This Court disagrees *Riley* because it goes against 134 years of case law specifically concluding[28] or assuming that the *qui tam* provisions are constitutional and/or that the relator has standing to bring the action even though the relator has suffered no injury.

In *Riley*, Judge Hoyt ruled that despite congressional authorization under the FCA, 31 U.S.C. § 3730(b)–(d),[29] the relator lacks standing under Article III, section 2 of the federal Constitution requiring that a court hear only an actual "case or controversy" and that Congress violated the separation of powers in authorizing such suits. 982 F.Supp. at 1262. Basing his decision on this "irreducible constitutional minimum" for standing, *id.* at 1263, as defined in *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992), Judge Hoyt contended that a plaintiff must satisfy three requirements: (1) an "injury in fact," i.e., the invasion of a legally protected interest that is concrete and particularized, as well as actual or imminent and not conjectural or hypothetical; (2) a causal connection between the injury and the conduct complained of, i.e., the injury must be "fairly trace[able] to the challenged action of the defendant and not ... the[e] result [of] the independent action of some third party not before the court"; and (3) the likelihood, in contrast to speculation, that the injury will be redressed by a favorable decision. *Lujan*, 504 U.S. at 560–61, 112 S.Ct. 2130. Thus the relator, himself, must be among the injured, and the court must examine the substantive issues to determine whether there is a logical nexus between the relator's asserted status and the claim to be adjudicated. In addition to these Article III requirements, Judge Hoyt further pointed to prudential[30] considerations, in-

---

**28.** *See, e.g., United States ex rel. Kreindler & Kreindler v. United Technologies Corp.*, 985 F.2d 1148 (2d Cir.1993); *United States ex rel. Taxpayers Against Fraud v. General Electric Co.*, 41 F.3d 1032 (6th Cir.1994); *Kelly*, 9 F.3d 743 (9th Cir. 1993); *United States ex rel. Hall v. Tribal Dev. Corp.*, 49 F.3d 1208 (1995).

**29.** *"Qui tam"* is an abbreviation of *"quit tam pro domino rege quam pro se imposo sequitur,"* which means "he who brings the action for the king as for himself." *Kelly*, 9 F.3d at 746. The FCA authorizes private individuals, called *"qui tam* plaintiffs" or "relators," to sue on behalf of the United States for conduct defrauding the government. § 3730(b). The relator files his complaint under seal and *in camera* and serves on the United States, but not on the defendant, a copy of that complaint and a written disclosure of substantially all material evidence and information. § 3730(b)(2). The complaint remains under seal for sixty days. § 3730(b)(2). Meanwhile the government may choose either to intervene and prosecute the action or to permit the relator to prosecute by itself. § 3730(b)(4)(A) and (B). Here the government has chosen not to participate under § 3730. If the government does intervene, the relator may continue as a party to

the suit, but the government is not bound by his acts. § 3730(c)(1). For bringing and pursuing the suit, a relator receives a proportion of the final award, depending on whether the government intervenes. If the government intervenes, the relator receives between 15–25%, and if the government decides not to intervene, the relator receives 25–30% of the recovery. § 3730(d)(2). In light of the government's substantial role even where it chooses not to intervene, the Court finds Defendants' objections to giving weight to the *amicus curiae* brief fatuous.

There are, moreover, restrictions placed on the government's ability to dismiss or settle a *qui tam* action. The court and the attorney general must submit written consent to the dismissal and give the reasons underlying their consent. § 3730(b)(1). Settlement is allowed only if the court grants a hearing and determines that "the proposed settlement is fair, adequate, and reasonable under all the circumstances". § 3730(c)(2)(B).

**30.** Prudential requirements are not based on the Constitution, but have arisen in common law and court-created criteria to improve judicial efficiency.

cluding that a plaintiff must assert his own legal rights and interests, not those of third parties, and that the complaint fall within the "zone of interests" protected by the statute in question. *Riley,* 982 F.Supp. at 1264.

Applying these conditions and responding to the Ninth Circuit's contrary arguments in *Kelly,* 9 F.3d at 748 and the Second Circuit's in *Kreindler,* 985 F.2d at 1154, Judge Hoyt maintains that there is no indication in the FCA that Congress was trying to "bestow a contract right to recover damages on the qui tam plaintiffs who were not even identified at the time of passage, and are not identifiable until they themselves initiate suit." 982 F.Supp. at 1265. Such an assignment in theory would swallow the standing requirement. *Id.* Nor does Congress have the power to assign a contract right of which the Executive, and not Congress, is the owner. *Id.* Furthermore, there is no existing right and "[a] promise to make an assignment in the future is not an assignment." *Id.* Even if Congress could assign the Executive's future right to prosecute, any interest in recovering damages in a future case would not be a vested interest capable of transfer. *Id.* Judge Hoyt remarked that even where citizen suits by private attorneys general and *jus tertii* cases are permitted, the injury-in-fact requirement is still observed. *Id.* at 1266. Because the standing requirement is integral to the separation of powers doctrine, Judge Hoyt insisted that courts should not permit Congress to legislate around Article III standing requirements. *Id.* Judge Hoyt concluded that in *Riley,* the relator suffered no injury-in-fact to a cognizable interest that is concrete and particularized, actual or imminent. *Id.* at 1268–69. Nor was there a causal connection between the injury and the conduct about which the relator complained. Therefore the relator/plaintiff lacked standing, since Congress cannot circumvent standing requirements of Article III nor statutorily assign the Executive's potential future interest in pursuing a particular fraud claim to an unknown plaintiff without an injury.

This Court disagrees with Judge Hoyt's conclusions and instead concurs with those of the Circuit courts that have addressed the issue and found the *qui tam* provisions of the FCA constitutional. The Fourth Circuit, in *Berge,* 104 F.3d at 1457–58, concluded with a number of its sister circuits that where the government has suffered an injury-in-fact, the relator merely steps in as its representative or assignee to effectuate the statute's purpose of uncovering fraud against the government. *See also United States ex. rel. Hall v. Tribal Dev. Corp.,* 49 F.3d 1208, 1212–14 (7th Cir.1995) ("Once we accept the premise that the United States is the real plaintiff in a qui tam action, it stands to reason that challenges to the standing of the government's representative are beside the point.... Requiring an additional showing of injury on the part of the qui tam relator would be an analytical redundancy."); *Kelly,* 9 F.3d at 748 ("[T]he FCA effectively assigns the government's claims to qui tam plaintiffs ..., who then may sue based upon an injury to the federal treasury."); *Kreindler,* 985 F.2d at 1154 ("In a qui tam action, the plaintiff sues on behalf of and in the name of the government and invokes the standing of the government resulting from the fraud injury"); *Milam,* 961 F.2d at 49 ("[T]he government, and not the relator, must have suffered the injury-in-fact required for Article III"). In *Kelly,* the Seventh Circuit emphasized that the FCA provided sufficient executive control of a *qui tam* suit to meet constitutional requirements because only a portion of the claim is assigned: as noted *supra,* the government can intervene at the start and control the entire litigation or retain throughout the right to intervene upon a showing of good cause, it has greater control over ending the suit if not in initiating the action, and it is to receive the majority share of any recovery no matter which path it takes. 9 F.3d at 753–54. That control of the relator's prosecutorial powers protects the separation of the executive from the Judicial branch. *Id.* at 754–57. The Sixth Circuit agrees. *United States ex rel. Taxpayers Against Fraud v. General Electric Co.,* 41 F.3d 1032, 1041 (6th Cir. 1994). Moreover, in *Kreindler,* 985 F.2d at 1154, the Second Circuit further noted that the relator has a personal stake in the outcome of an FCA suit because he funds the prosecution of the suit, will receive a private share in the government's recovery only if he

prevails, and he may be liable for costs if the suit is dismissed as frivolous. The long history of qui tam actions is frequently raised as an indication of validation; as the Supreme Court's observed in *Marvin v. Trout*, 199 U.S. 212, 225, 26 S.Ct. 31, 50 L.Ed. 157 (1905) ("Statutes providing for actions by a common informer, who himself had no interest whatever in the controversy other than that given by the statute have been in existence for hundreds of years in England, and in this country ever since the foundation of the Government."). Some district courts have added the point that the likelihood of employer retaliation against the whistleblower relator is great. *See, e.g., Burch*, 803 F.Supp. at 119; *Stillwell*, 714 F.Supp. at 1099. This Court further observes that appellate courts scrutinize their jurisdiction before reviewing the issues of each case, and none, including the Supreme Court,[31] in ruling on FCA cases has yet determined that it lacked jurisdiction because an FCA *qui tam* relator lacked standing.

Having determined that the *qui tam* provisions of the FCA are constitutional and a relator stating a claim has standing, the Court turns to the issues on remand.

**B. Cost Report Certifications as a Condition of Medicare Payments**

 First, the Court concludes that Plaintiffs have stated a claim for violation of the FCA by Defendants' alleged false certification that the Medicare services identified in the annual hospital cost reports complied with the laws and regulations dealing with the provision of healthcare services. The alleged prohibited financial relationships among Defendants and referring physicians made the certifications false statements. In addition to highlighting express statements in the relevant statutes and HCFA form 2552, Plaintiffs have provided evidence in the declaration of David Goldberg that HCFA relied on the certifications in determining the

issues of payment and retention of payment as well as continued eligibility for participation in the Medicare program. The declaration also makes clear the nexus between the certifications and the injury to the government.

The Court disagrees with Defendants' rejection of David Goldberg's declaration as inadmissible on the grounds that it merely expressed a legal opinion of HCFA and Defendants' reliance on *Vernon*, 21 F.3d at 695. In *Vernon*, two experts provided affidavits expressing their opinions whether the purchaser of the assets of a provider is obligated for over payments made to the prior provider, purely a legal question. In the instant case, Goldberg and his department were personally involved in making the decisions regarding Medicare payments to providers and in the procedures that the Secretary of HHS was applying in determining whether such payments should be made and/or retained. As the agency charged with enforcing regulations, moreover, HHS' and its subdivision's, HCFA's, interpretation of those regulations is entitled to deference. As the Fifth Circuit stated in *Griffon v. United States Department of Health and Human Services*, 802 F.2d 146, 148 (5th Cir.1986),

> Administrators are accorded considerable deference to effectuate the purposes of statutes. *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, [104 S.Ct. 2778, 81 L.Ed.2d 694] ... (1984) ("a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency. We have long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer, and the principle of deference to administrative interpretations 'has been consistently followed....' ") (quoting *United States v. Shimer*, 367 U.S. 374, [81 S.Ct. 1554, 6

---

**31.** Indeed, the Supreme Court had an opportunity to review a challenge to the constitutionality of the *qui tam* provisions in the FCA as violative of the Article III standing requirement, the doctrine of separation of powers, and the Appointment Clause's limitations on who may conduct litigation on behalf of the United States and chose not

to do so, although it did grant certiorari on other issues. *United States ex rel. Schumer v. Hughes Aircraft Co.*, 63 F.3d 1512 (9th Cir.1995), *cert. granted in part*, —— U.S. ——, 117 S.Ct. 293, 136 L.Ed.2d 212 (1996), *judgment vacated*, 520 U.S. 939, 117 S.Ct. 1871, 138 L.Ed.2d 135 (1997).

L.Ed.2d 908] ... (1961)) (footnotes omitted) ...; *see also Zenith Radio Corp. v. United States,* 437 U.S. 443, [98 S.Ct. 2441, 57 L.Ed.2d 337] ... (1978); *Chemical Mfrs. Assoc. v. Natural Resources Defense Council, Inc.,* 470 U.S. 116, [105 S.Ct. 1102, 84 L.Ed.2d 90] ... (1985). A court of appeals can only invalidate an administrator's interpretation if that interpretation is unreasonable. *Chevron,* 104 S.Ct. at 2783. *See also Newport News Shipbuilding and Dry Dock Co. v. Garrett,* 6 F.3d 1547, 1557 (Fed.Cir.1993) (where the legislative delegation to an agency on a particular question is implicit, a court may not substitute its own construction of a statutory provision or a regulation embodying a reasonable interpretation of it made by the administrator of an agency); *Bernstein v. Sullivan,* 914 F.2d 1395, 1399 (10th Cir.1990) ("An administrative agency's interpretation of a statute which the agency is entrusted to administer is entitled to considerable deference by a reviewing court") (*citing Chapman v. United States Dep't of HHS,* 821 F.2d 523, 527 (10th Cir.1987)). Defendants have not asserted nor demonstrated that HCFA's interpretation was unreasonable, but even it they had, such is an issue is not within the scope of a motion to dismiss.

**C. Violations of the Stark Laws and the Anti–Kickback Statute**

■ The second issue is whether the Stark laws' express prohibition on payment for services rendered in violation of their own terms makes such alleged violations actionable under the FCA.

■ The Court concludes that it does. Relator has stated a claim under the FCA for violation of the express terms of § 1395nn of the Stark laws in alleging that the government was injured by Columbia Defendants' submissions for Medicare payments which they knew they were statutorily prohibited from receiving because the claims came out of an alleged scheme of illegal self-referrals among the Columbia entities and physicians linked by illicit financial relationships. The

Court agrees with Plaintiffs that a pecuniary injury to the public fisc is no longer required for an actionable claim under the FCA. *Rex Trailer,* 350 U.S. 148, 76 S.Ct. 219, 100 L.Ed. 149; *Ridglea State Bank,* 357 F.2d at 497. Plaintiffs have cited substantial authority for their argument that payments to improper claimants that know they are statutorily ineligible and prohibited from seeking such payments from the government constitute injury to the treasury. Furthermore, as Plaintiffs have argued, there were additional monetary losses to the government in investigative and administrative costs requiring expenditure of government funds, not to mention civil penalties triggered by the conduct for which the complaint alleges Defendants are liable.

■ The Court further finds that Relator has also stated a claim for a violation of the FCA based on the alleged scheme of self-remuneration in violation of the "anti-kick-back statute," the Medicare Anti–Fraud and Abuse Act, 42 U.S.C. § 1320a–7b(a) and (b), which prohibits the making of any false statements, failing to disclose material information, or making false statements or representations to qualify as a certified Medicare provider in applying for Medicare payments. Relator has asserted that the explicit certifications of compliance with relevant health-care laws and regulations were false and fraudulent and provided evidence that the government conditioned its approval, payment and Defendants' retention of payment funds on those certifications. He has shown injury to the government and alleged that the government would not have paid the claims submitted by these Defendants, in knowing violation of the statutory provisions, had it known of the alleged self-referral and kick-back violations, which Defendants allegedly concealed from the government.

■ While there is a dearth of case law on point, Relator makes a persuasive argument under *Peterson,* 508 F.2d at 52 (the FCA reaches "all fraudulent attempts to cause the Government to pay out sums of money"),[32]

**32.** As discussed earlier, in *Peterson,* a doctor signed Medicare claims forms that certified that he had performed the services or that the services were performed under his supervision

when another doctor had actually rendered them. The doctor contended that there was no violation of the FCA because the services were performed by other qualified individuals, the pa-

and in light of the legislative history and the purpose of the FCA that submission of such claims for services that were statutorily ineligible for payment under the Medicare Act constitutes a false claim within the ambit of the FCA.

Moreover, the case most nearly on point, cited by Relator, is *Pogue*, 914 F.Supp. 1507, is informative in its review of updated, current law, the legislative history, and thoughtful analysis. In that *qui tam* suit, Pogue alleged that Defendants' scheme violated the self-referral and the anti-kickback statutes in inducing physicians to refer Medicare and Medicaid patients to Defendant West Paces Medical Center. Initially the district court dismissed the case for failure to state a claim upon which relief can be granted on two, alternative grounds: (1) Pogue had failed to allege that any of the defendant's submitted claims was false and (2) Pogue had failed to allege that the government suffered actual damages because of the submission of these claims. Upon reconsideration, the district court concluded that in light of *Rex Trailer*, 350 U.S. at 152, 76 S.Ct. 219, *Marcus*, 317 U.S. 537, 63 S.Ct. 379, 87 L.Ed. 443, *Schumer*, 63 F.3d at 1525, *Ridglea State Bank*, 357 F.2d at 497, and other cases, an FCA plaintiff need not show actual damages. The court further found that in submitting their claims, Defendants implicitly certified that they had complied with all statutes, rules, and regulations governing the Medicare Act, including the federal anti-kickback and self-referral statutes.[33] It also pointed to a "recent trend of cases" concluding that "a violation of Medicare anti-kickback and self-referral laws also constitutes a violation of the False Claims Act." 914 F.Supp. at 1509, *citing inter alia, U.S. ex rel. Roy v. Anthony*, 914 F.Supp. 1504 (S.D.Ohio 1994); *Ab–Tech*

*Constru., Inc. v. United States*, 57 F.3d 1084 (Fed.Cir.1995) (submission to SBA of false payment vouchers to dupe the government regarding services illegally performed with a non-minority owned enterprise without SBA's approval represented implied certification by the plaintiff of continuing compliance with the SBA program requirements); *U.S. v. Incorporated Village of Island Park*, 888 F.Supp. 419 (E.D.N.Y.1995). The *Pogue* court concluded that the FCA "was intended to include not only situations in which a claimant makes a false statement or submits a false record in order to receive payment but also those situations in which the claimant engaged in fraudulent conduct in order to receive payment." *Id.* at 1511. The court pointed to the legislative history showing that Congress intended the FCA to cover "each and every claim submitted under a contract, loan guarantee, or other agreement which was originally obtained by means of false statements or other corrupt or fraudulent conduct, or in violation of any statute or applicable regulations...." *Id., citing* S.Rep. No. 345, 99th Cong., 2d Sess. 9 (1986), reprinted in 1986 U.S.C.A.A.N. 5266, 5274. That legislative history furthermore reflects that "claims may be false even though the services are provided as claimed if, for example, the claimant is ineligible to participate in the program...." *Id.* It furthermore noted that the primary purpose of the FCA, as amended in 1986, is "to encourage reports of fraud by private citizens in order to protect government funds." *Id.* at 1512. Thus, it concluded "that the False Claims Act was intended to govern not only fraudulent acts that create a loss to the government[,] but also those fraudulent acts that cause the government to pay out sums of money to

---

tients receiving the services were entitled to them under Medicare, there was no financial loss to the government since it would have paid for the services by the doctor, and there was no financial loss to the government. *Id.* The Fifth Circuit differed and held that since the services for which claims were filed were not performed by the doctor or under his supervision, "the services billed were plainly not 'covered' services, and the Government thus paid on the basis of the false claims presented." *Id.* "Obviously, a false certification [by the doctor] on the claim form frustrated the Government's attempt to process only

valid claims and let to the payment for services which were not covered or payable...." *Id.* The case is distinguishable from the instant case in that the services rendered were not services covered by Medicare.

**33.** This Court finds that the while this theory of implied certification might prove to be an Achilles heel in the *Pogue* court's analysis, it is not relevant here because of the express certifications of compliance.

claimants it did not intend to benefit." *Id.* at 1513.

### D. Separate and Independent Violation of 31 U.S.C. § 3729(a)(2)

■ Plaintiffs allege that in submitting their reports, Defendants knowingly made, used, or caused to be made or used, false records or statements (the false and fraudulent certifications) to obtain from the government approval or payment for false or fraudulent Medicare claims, in violation of 31 U.S.C. § 3729(a)(2). Such conduct, claim Plaintiffs, constitutes the presentation of false claims within the meaning of § 3729(a)(1). They further allege that Defendants knowingly made and caused to be made such false and fraudulent records or certifications that in turn were used to conceal, avoid or decrease obligations to pay money to the United States in violation of § 3729(a)(7).

While there is no case law on point, Relator's allegations that the Columbia Defendants made or caused to be made false statements to the government to obtain payment of claims based on them is a literal and logical application of the statute. Therefore the Court concludes that Relator has stated a claim under § 3729(a).

### E. Liability of Columbia/HCA and CHC Holdings; of CBAS

Plaintiffs have raised as an issue, but there is insufficient evidence in the record for the Court to determine, the nature of the relationships among the parent and subsidiary Columbia Defendants. Moreover, under theories of alter ego, control, and use of the Columbia entities as conduits to pierce the corporate veil, asserted by Relator in his proposed third amended complaint and response to the motion to dismiss, he has stated a claim against them. For this reason the Court finds that discovery should be pursued before any decision regarding dismissal of one or more of the affiliated entities can be made. The same is true for CBAS, whose business relationship with Columbia is not fully known.

### F. Pleading with Particularity pursuant to Fed.R.Civ.P. 9(b)

■ The Court also finds that the complaint has been pled with sufficient particularity to satisfy Rule 9(b). The basic framework, procedures, the nature of fraudulent scheme, and the financial arrangements and inducements among the parties and physicians that give rise to Relator's belief that fraud has occurred have been alleged with specificity; Plaintiffs are entitled to discovery before being required to list every false claim, its dates, the individuals responsible, and why each patient was not eligible for Medicare.

Finally because the Court has concluded that Plaintiffs have stated claims, it sees no reason why it should not grant Relator's motion for leave to amend at this pre-discovery stage of the litigation, especially when the purpose of the amended pleading is greater specificity.

For the reasons delineated above, the Court ORDERS the following:

(1) Defendant CBAS' motion to dismiss or for summary judgment and Defendants Columbia/HCA Healthcare Corporation, CHC Holdings, Inc., Columbia Hospital Corporation of Bay Area, Columbia Hospital Corporation of Corpus Christi, and Columbia Surgicare Specialty Hospital's second amended motion to dismiss or, in the alternative, motion for summary judgment are DENIED; and

(2) Relator's motion for leave to amend complaint is GRANTED.

The Court further

ORDERS that this case is REFERRED to United States Magistrate Judge Frances Stacy to establish a Rule 16 docket control schedule as swiftly as possible.